EXHIBIT A

1      UNITED STATES DISTRICT COURT
2      CENTRAL DISTRICT OF CALIFORNIA
3
4   _____
                                  )      **CERTIFIED**
5   ONIER VARGAS, an individual,  )      **TRANSCRIPT**
                                  )
6          Plaintiff,            )
                                  )
7      vs.                       )   No. 2:16-CV-02921-AB-AJW
                                  )
8   WAL-MART STORES, INC.; SAM'S )
    CLUB, entity form unknown;   )
9   MARINA AGUILAR, an           )
    individual; and DOES 1       )
10  through 50, inclusive,       )
                                  )
11         Defendants.           )
    _____)
12
13
14
15      DEPOSITION OF ONIER L. VARGAS
16          Los Angeles, California
17         Monday, January 16, 2017
18              Volume I
19
20
21  Reported by:
    NADIA NEWHART
22  CSR No. 8714
23  Job No. 2522296
24  PAGES 1 - 230
25

                                          Page 1

```
 1        A    I don't -- I never consider drinking like --
 2   drinking alcohol.   Maybe just one beer.
 3        Q    So you still do drink alcohol occasionally?
 4        A    Occasionally.
 5        Q    When is the last time you had any alcohol?    09:41
 6        A    Maybe -- maybe three months.
 7        Q    Has any doctor told you that you're incapable
 8   of giving your most complete and accurate testimony
 9   here today?
10        A    No.                                           09:42
11        Q    Do you believe there's any reason why you
12   can't give your most complete and accurate testimony
13   here today?
14        A    No.
15        Q    Is there any reason why you believe that your  09:42
16   deposition cannot proceed today?
17        A    No.
18        Q    When did you first apply for a job at Pace?
19             MR. LIBMAN:   Objection.   Pace, you said?
20             MS. GRANT:   Correct.                          09:42
21             MR. LIBMAN:   Okay.
22             THE WITNESS:   That was December in 1990.
23   BY MS. GRANT:
24        Q    And what position did you apply for?
25        A    It was night -- night crew, night stocker.    09:43
```

Page 14

```
 1        Q    And did Wal-Mart buy Pace, or was Pace an

 2    affiliate of Wal-Mart, as far as you're aware?

 3        A    My understanding is Pace and Wal-Mart agreed

 4    to take the time we worked with Pace as part of

 5    Wal-Mart.                                            09:43

 6        Q    So Wal-Mart acquired Pace, as far as you're

 7    aware?

 8             MR. LIBMAN:  Objection; that calls -- lacks

 9    foundation, calls for legal conclusions,

10    speculation.                                         09:43

11             Go ahead, answer.

12             THE WITNESS:  Wal-Mart acquired Pace.

13    BY MS. GRANT:

14        Q    After Wal-Mart acquired Pace, did you become

15    an employee of Wal-Mart?                             09:44

16        A    Yes.

17        Q    When was that?

18        A    I don't know the date.

19        Q    When did you hire the law firm representing

20    you in the deposition today?                         09:44

21             MR. LIBMAN:  Objection; attorney-client

22    privilege.

23             What's the relevance of that?

24             MS. GRANT:  The date is not subject to

25    attorney-client privilege.  I'm not asking for a     09:45
```

                                                     Page 15

1    misstates the evidence.

2          THE WITNESS:  I never said -- I said I never

3    read the paragraph.  I fill up the application and I

4    submitted the application.  And at the time, I

5    signed it and submit it, and I was just hoping to        10:49

6    get an employment -- a job.

7          MS. GRANT:  Move to strike.

8      Q   I'm not asking you about the application

9    right now.  My question to you was whether, yes or

10   no, you understood at the time you were working         10:50

11   there that your employment was at will.  I didn't

12   ask you anything about the application.

13     A   No, I didn't know that.

14     Q   Thank you.

15         Did anybody at Pace tell you that your            10:50

16   employment was not at will?

17     A   No.

18         MS. GRANT:  I'd like to mark as Exhibit 2 a

19   Wal-Mart -- excuse me, new hire acknowledgement

20   dated January 6th, 1994.                                10:50

21         (Exhibit 2 was marked for identification

22            by the court reporter and is attached hereto.)

23         (Ms. Bass left the proceedings.)

24   BY MS. GRANT:

25     Q   Have you seen Exhibit 2 before?                   10:53

                                              Page 73

```
 1      A    Yes.  I saw it, I signed it, and I date it.

 2      Q    Is that your signature?

 3      A    Yes, that's my signature.

 4      Q    And did you sign this document on or about

 5   January 6th, 1994?                                    10:53

 6      A    Yes, that date is there.

 7      Q    And does that refresh your recollection as to

 8   when you began working for Wal-Mart?

 9      A    I don't remember.  It's been a while back,

10   but when some -- when Wal-Mart took over, they --     10:53

11   they had new paperwork.  So this is part of those --

12   the new paperwork.  So it has been a while since I

13   saw this.  I don't remember.

14      Q    You don't remember what?

15      A    The paper, seeing this paper.  It's been a    10:54

16   long time.  It was 1994.

17           So I signed it and I date it, so I had to be

18   in contact with this paper and that date.  So I saw

19   it at that -- but I didn't remember.  This paper, I

20   didn't remember.                                      10:54

21      Q    When did you begin working for Wal-Mart?

22      A    Since December 1990, they told us that any

23   time we had with Pace, it would be the same time

24   with Wal-Mart.  So there wouldn't be no different.

25   So whatever time I had with Pace, it was the same     10:54
```

Page 74

```
 1    with Wal-Mart.  So I started with Wal-Mart

 2    December 1990.

 3        Q    So what was your understanding when you

 4    signed Exhibit 2?

 5        A    A bunch of papers that they give you to -- to    10:55

 6    sign.  They do that all the time.  They always give

 7    you a lot of paper to sign.  So this is just one

 8    more paper that they gave us for us to sign and

 9    submit.

10        Q    So it was your understanding when you signed    10:55

11    Exhibit 2 in January 6th -- on or about January 6th,

12    1994, that you were already an employee of Wal-Mart?

13        A    I was already employee of Wal-Mart, yes.

14        Q    That was your understanding?

15        A    Yes.                                             10:55

16        Q    And so did you read Exhibit 2 before you

17    signed it?

18        A    Very unlikely.

19        Q    What was your first position at Wal-Mart?

20        A    When I was hired, I was hired as a night        10:56

21    stocker, night crew, stocking the shelves.  So night

22    stocker.

23        Q    And during what period of time were you a

24    night stocker?

25        A    Don't know the exact time but maybe about two   10:56
```

Page 75

1    years.

2        Q    What was your next position?

3        A    The next position was promotion --

4            MR. LIBMAN:  By the way, just to clarify we

5    are getting the record correctly, night stocker,        10:56

6    s-t-o-c-k-e-r, and not any other spelling, right?

7            THE REPORTER:  Yes.

8            MR. LIBMAN:  Great.  Thank you.  Not night

9    stalker.

10           MS. GRANT:  Could you please not interrupt my    10:56

11   deposition?

12           MR. LIBMAN:  I'm not.  I'm just making sure

13   the record is clear.

14           MS. GRANT:  If you would like to check

15   spellings with the court reporter, I would ask that      10:57

16   you do so at a break and not in the middle of my

17   questioning.

18           MR. LIBMAN:  Well, I thought it was

19   appropriate, but go ahead.

20           THE WITNESS:  What's the question?             10:57

21           MS. GRANT:  Could you please repeat the

22   question I asked before Mr. Libman interrupted.

23           MR. LIBMAN:   I object to the characterization

24   of "interruption."

25           (Record read as follows:

                                                    Page 76

```
 1              "What was your next position?")

 2         ANSWER:  "The next position was promotion" --

 3    )

 4         THE WITNESS:  To tobacco associate.

 5         THE REPORTER:  To what?                      10:57

 6         THE WITNESS:  Tobacco associate, like

 7    cigarettes.

 8         THE REPORTER:  Tobacco.  Thank you.

 9         MS. GRANT:  I want to go off the record.

10         MR. LIBMAN:  Sure.  How long do you want to   10:58

11    go off the record?

12         MS. GRANT:  A couple minutes.

13         MR. LIBMAN:  Okay.

14         (Recess 10:58-11:01.)

15         MS. GRANT:  Could you please reread the last  11:01

16    question and answer.

17         (Record read as follows:

18         "What was your next position?")

19         ANSWER:  "The next position was

20         promotion" -- )                              11:02

21         MS. GRANT:  Thank you.

22    Q    And how long were you a tobacco associate?

23    A    For the most part of my time with the

24    company.

25    Q    After you became a tobacco associate, did you 11:02
```

Page 77

1    I'm actually asking.

2         MR. LIBMAN:  Well, you did not lay a

3    foundation in terms of, you know, how he understood

4    your question, so it's vague and ambiguous.

5         Thank you for pointing that out.                    11:11

6         MS. GRANT:  Well, he answered it.  And he

7    agreed at the beginning of the deposition that he

8    would only answer questions he understood.

9         MR. LIBMAN:  Okay.  It's vague and ambiguous.

10        THE WITNESS:  I was tobacco associate.  My        11:11

11   duties, they -- we stock the shelf, rotate

12   merchandise, receive merchandise, ship merchandise,

13   ring up members, load up their shopping carts, stamp

14   the cigarettes order -- order merchandise.  Those

15   were my duties.                                          11:11

16   BY MS. GRANT:

17      Q    And when did those become your primary

18   duties?

19      A    When I was promoted to tobacco associate.

20      Q    Around what date did those become your          11:12

21   primary duties?

22      A    I was -- when I was promoted, it was probably

23   two years after I work night.

24      Q    You mean as the night stocker?

25      A    Yes.                                             11:12

                                            Page 82

```
 1    tobacco associate, as you put it, did you still

 2    perform the tobacco associate duties that you've

 3    described?

 4       A   Yes.

 5       Q   And did you have other duties as the tobacco     11:14

 6    cashier?

 7       A   Anywhere they needed help, if we could help,

 8    we'd help.

 9          MS. GRANT:  I'd like to mark as Exhibit 4 a

10    job description for tobacco cashier dated            11:14

11    November -- February 13th, 2006.

12          (Exhibit 4 was marked for identification

13        by the court reporter and is attached hereto.)

14    BY MS. GRANT:

15       Q   Is that your signature on the last page of     11:15

16    Exhibit 4?

17       A   Yes.

18       Q   And did you sign Exhibit 4 on or about

19    February 13th, 2006?

20       A   Yes.                                            11:15

21       Q   And did you begin to perform the duties of a

22    tobacco cashier on or about February 13th, 2006?

23       A   It was way before this date.  They probably

24    came up with these forms at one point, but I was

25    working as a tobacco associate way before 2006.        11:16
```

Page 84

1    no.

2       Q   So you could not have been performing the

3    duties as a tobacco cashier 20 years before February

4    of 2006, correct?

5       A   No.                                              11:18

6          THE REPORTER:  Counsel, I think my office is

7    trying to reach you.

8          MS. GRANT:  Let's go off the record.

9          MR. LIBMAN:  Okay.  Off the record.

10         (Recess 11:18-11:28.)

11         (Ms. Bass left the proceedings.)

12         MS. GRANT:  Can you please repeat the last

13   question and answer.

14         (Record read as follows:

15           "QUESTION:  So you could not have been

16           performing the duties as a tobacco cashier

17           20 years before February of 2006, correct?

18           "ANSWER:  No.")

19   BY MS. GRANT:

20      Q   Does Exhibit 4 accurately reflect your duties   11:28

21   as a tobacco cashier?

22      A   Which one is 4?

23         MR. LIBMAN:  It's right here.

24         THE WITNESS:  The majority is here.  There's

25   always things that we did that probably are not        11:31

                                                    Page 87

```
 1    here.
 2    BY MS. GRANT:
 3        Q    Is there anything listed on Exhibit 4 that
 4    was not part of your duties as a tobacco cashier?
 5             MR. LIBMAN:  Objection; the document speaks    11:32
 6    for itself, calls for legal conclusions.
 7             Go ahead.
 8             Overbroad.
 9             THE WITNESS:  No.
10    BY MS. GRANT:                                           11:32
11        Q    What additional duties as a tobacco cashier
12    did you have that are not listed on Exhibit 4?
13        A    I operated a forklift to lower the
14    merchandise from the upper steel down to the floor.
15    That's not here.  I didn't see it.                      11:32
16             I return merchandise that I don't -- I don't
17    recall seeing it here.
18             I did price comparison with competition that
19    I don't -- I didn't see it here.
20             And also, I visited small businesses.          11:33
21             MR. LIBMAN:  I'm sorry?
22             THE WITNESS:  I visited --
23             MR. LIBMAN:  Oh.
24             THE WITNESS:  -- small businesses to promote
25    the merchandise and membership, and that is not        11:33
```

Page 88

1    here.

2        I did inventories, and I also stamped

3    merchandise with a California tax stamp.  I didn't

4    see it here.

5    BY MS. GRANT:                                          11:34

6        Q    Anything else?

7        A    Could be others, but at the moment, I don't

8    remember.

9        Q    And when you said you visited small

10   businesses to promote merchandise and membership,     11:34

11   what did that entail?

12       A    Can you explain me the -- can you rephrase

13   the question, please.

14       Q    You said that you visited small businesses to

15   promote merchandise and membership, correct?          11:34

16       A    Yes.

17       Q    What did that entail?

18            MR. LIBMAN:  What did that involve?

19            THE WITNESS:  Oh, thank you.

20            MR. LIBMAN:  Did you not understand the word   11:34

21   "entail"?

22            THE WITNESS:  No.

23            MR. LIBMAN:  That's fine.

24            THE WITNESS:  Thank you.

25            It involve driving our car to -- in a           11:35

                                            Page 89

```
 1    specific area and go in and talk to the owner or the

 2    employee and introduce ourselves and explain them

 3    about our products and our membership and our hours,

 4    basically soliciting type of thing.

 5    BY MS. GRANT:                                          11:35

 6        Q    And you engaged in those duties as part of

 7    your job as a tobacco cashier?

 8        A    Yes.

 9        Q    And what time frame were you engaged in those

10    duties?                                                11:35

11        A    Time frame?

12        Q    And by "those duties," I mean visiting small

13    businesses to promote merchandise and membership.

14        A    Two to three hours.

15        Q    Two to three hours a what?                    11:36

16        A    Visiting the businesses in the morning.

17        Q    How often did you visit small businesses to

18    promote merchandise and membership?

19        A    Like once a week.

20        Q    And when was the first time you visited the   11:36

21    small businesses to promote merchandise and

22    membership?

23        A    I don't remember the time.

24        Q    Was it after February of 2006?

25        A    It's very possible, but I don't know the      11:36
```

Page 90

1    question the best --

2         MS. GRANT:  I'm not staring at you.  I just

3    glanced over at you.

4         MR. LIBMAN:  Believe me, I know a glance from

5    a stare.  I went to law school.  You know, I can          11:41

6    recognize these things once in a while.

7         MS. GRANT:  I disagree with your

8    characterization.  But again, I don't want to get

9    into a back and forth with you.  We're here to take

10   your client's deposition.                                11:41

11        MR. LIBMAN:  Wonderful.

12   BY MS. GRANT:

13     Q   Are there any records in your possession that

14   you could look at to determine when you engaged in

15   the duty of visiting small businesses to promote        11:41

16   merchandise and membership?

17        MR. LIBMAN:  Objection; calls for

18   speculation, may call for legal conclusions, may

19   call for work product.

20        Go ahead and answer to the best of your            11:42

21   ability.

22        THE WITNESS:  No.

23   BY MS. GRANT:

24     Q   And when you operated a forklift to lower

25   merchandise, was that part of your duties as a          11:42

                                        Page 95

Exhibit A - Page 17

```
 1    tobacco cashier?

 2       A    Yes.

 3       Q    And when you returned merchandise, to where

 4    would you return merchandise?

 5       A    To our supplier.                              11:42

 6       Q    Did that involve leaving Sam's Club to return

 7    the merchandise to the supplier?

 8       A    It involved me taking the merchandise from

 9    the tobacco area to the receiving area.

10       Q    So you took the merchandise from the tobacco   11:42

11    area at Sam's Club to the receiving area at Sam's

12    Club?

13       A    Yes.

14       Q    And that's how you returned the merchandise

15    to the supplier?                                      11:43

16       A    That was the procedure to return the

17    merchandise to the supplier.

18       Q    Other than operating the forklift to lower

19    merchandise, returning the merchandise to the

20    receiving area to go back to the suppliers, doing    11:43

21    price comparisons with competition, visiting small

22    businesses to promote merchandising and membership,

23    doing inventories and stamping merchandise with the

24    California tax stamp, did you engage in any other

25    duties as a tobacco cashier that are not listed on   11:43
```

                                                    Page 96

1  Exhibit 4?

2     A   I said there could be other ones, but I don't

3  remember.  At this moment, I don't remember.  I will

4  have to focus more -- take more time to remember --

5     Q   Is --                                           11:43

6     A   -- all the things we did.

7     Q   Are you able to focus on your deposition

8  today?

9         MR. LIBMAN:  Objection; argumentative.

10        THE WITNESS:  I'm -- no.  I cannot answer --    11:44

11  I cannot -- I don't remember everything right now.

12  I'm trying to focus on your questions right now.

13        MS. GRANT:  Your client has told me he's

14  unable to focus on his deposition today.

15        MR. LIBMAN:  That's not what my client said.    11:44

16  You're mischaracterizing --

17        MS. GRANT:  I asked him if he was able to

18  focus on this deposition today, and he said no.

19        THE WITNESS:  Yes, ma'am.  I am focusing on

20  your questions.  You are asking me what else I did,    11:44

21  and I said I don't remember the other things we did

22  that are not on this list, ma'am.

23  BY MS. GRANT:

24     Q   So are you able to focus on your deposition

25  today?                                                 11:44

Page 97

Exhibit A - Page 19

```
 1      A    Yes.

 2      Q    Is there anything that's preventing you from

 3   focusing on your deposition today?

 4      A    No.

 5      Q    So as you sit here today, you cannot recall    11:44

 6   any other duties that you had as tobacco cashier

 7   other than the ones you've described to me today,

 8   correct?

 9      A    Yes.

10      Q    When you were a tobacco cashier, who were      11:45

11   your supervisors, starting with your first

12   supervisor?

13      A    A lot of people came and transferred and got

14   promoted, many people.  I don't remember the

15   people's names.                                       11:45

16      Q    You don't remember any of the -- the names of

17   any of the supervisors while you were a tobacco

18   cashier?

19      A    I remember --

20          MR. LIBMAN:  Objection; argumentative.         11:45

21          THE WITNESS:  I remember the latest one, I

22   remember.

23   BY MS. GRANT:

24      Q    Please tell me all of the supervisors that

25   you had while you were a tobacco cashier that you      11:46
```

Page 98

1    remember, starting with the first supervisor you

2    had.

3        A    Starting with the first.  My last one was

4    Marina Aguilar.  And then before Marina, I had

5    Esperanza Lopez.  And then before Esperanza, it                11:46

6    could be Enrique Velarde, I think is his last name.

7    And then before them, maybe I had Charles Allen.

8    Maybe at one time Joel Siplicio, maybe Doug Bride,

9    like Doug --

10            THE REPORTER:  I'm sorry?                              11:47

11            THE WITNESS:  Doug, Doug.  That's as far as I

12    remember.

13    BY MS. GRANT:

14        Q    When was Marina Aguilar your supervisor?

15        A    The -- towards the final part of my                  11:47

16    employment with the company.

17        Q    When did she begin becoming your supervisor?

18        A    Maybe a year, maybe.

19        Q    So Marina Aguilar was your supervisor for

20    your last year of employment with Sam's Club?                 11:48

21        A    Approximately.

22        Q    When was Esperanza Lopez your supervisor?

23        A    Just before Marina.

24        Q    And how long was Esperanza Lopez your

25    supervisor?                                                   11:48

Page 99

```
 1    being your supervisor?
 2       A    Yes.
 3       Q    And was Doug Bride your supervisor
 4    immediately preceding Joel?
 5       A    Yes.                                    11:50
 6       Q    And how long was Doug your supervisor?
 7       A    Approximately a year.
 8       Q    Do you know, in the last five years of your
 9    time at Sam's Club, who your HR representatives
10    were?                                           11:51
11       A    Yes, I remember.
12       Q    Who were your HR representatives?
13       A    My HR representatives, Mina, Mina.  It's
14    possible that -- Garcia, maybe Mina Garcia.
15       Q    And how long was Mina Garcia your HR rep?  11:51
16       A    She was my human resources for as far as I
17    remember.
18       Q    More than five years?
19       A    More than five years.
20       Q    More than ten years?                    11:52
21       A    About -- about ten years.
22       Q    Who was your last club manager?
23       A    Last club manager, Angela.  I think her last
24    name is Deo.
25       Q    How long was Angela your club manager?   11:52
```

Page 102

Exhibit A - Page 22

```
 1      A    Maybe like six months.

 2      Q    Who was your club manager before Angela?

 3      A    Sana.   I can't remember her last name.

 4      Q    How long was Sana your club manager?

 5      A    Maybe for a year.                        11:53

 6      Q    Who was your club manager before Sana?

 7      A    I think it was Ron Folks.

 8      Q    And how long was he your club manager?

 9      A    Maybe for two years.

10      Q    And who was the club manager before him?   11:53

11      A    Maybe it was Daniel Mora.

12      Q    How long was he your club manager?

13      A    Maybe like a year.

14      Q    And who was the club manager before Daniel?

15      A    Maybe Daniel Park.                       11:54

16      Q    So Daniel Park was the club manager before

17 Daniel Mora?

18      A    Yes.

19      Q    And how long was Daniel Park your club

20 manager?                                           11:54

21      A    Maybe less than a year.

22      Q    Who was the club manager before Daniel Park?

23      A    I think his last name -- I don't remember.

24      Q    Do you remember any club managers before

25 Daniel Park?                                       11:55
```

Page 103

Exhibit A - Page 23

```
 1      A    I wasn't -- I didn't agree.

 2      Q    Right.  You didn't agree with your

 3   performance review; is that correct?

 4      A    Yes.

 5      Q    And who conducted that performance review      11:59

 6   with which you disagreed?

 7      A    I don't remember the manager's name.

 8      Q    When was that performance review conducted

 9   with which you disagreed?

10      A    I don't remember the time.                     11:59

11      Q    Did you note your disagreement on the

12   performance review?

13      A    I'm sorry.  Can you -- can you repeat the

14   question?

15      Q    Sure.  Did you note your disagreement on the   11:59

16   performance review?

17      A    I don't remember.

18      Q    When was the second time that you believe you

19   were treated unfairly while you worked at Sam's

20   Club?                                                  12:00

21          MR. LIBMAN:  Please respond subject to my

22   prior objections to this line of questioning.

23          THE WITNESS:  I think maybe -- maybe the last

24   time that I was with the company.

25   BY MS. GRANT:                                          12:00
```

Page 106

```
 1      Q    What do you mean by the last time you were
 2   with the company?
 3      A    Closer to the termination time.
 4      Q    How close to the termination time?
 5      A    2013.                                        12:00
 6      Q    What was the second thing that happened to
 7   you that you believe was unfair?
 8      A    I returned from my operation that I had on my
 9   knees.  And I couldn't walk like I did before, and I
10   was slow.  They asked me to -- to move faster.       12:01
11      Q    Who asked you to move faster?
12      A    Marina.
13      Q    Did anybody else ask you to move faster?
14      A    They joked around.  My coworkers joked
15   around.  I was returning from a surgery, so I wasn't  12:02
16   fast or -- I didn't move fast, so they joke around.
17   I was slow.
18      Q    Which coworkers joked around?
19      A    Cashiers and supervisors.
20      Q    Which cashiers joked around?                 12:02
21      A    I don't remember names.
22      Q    You don't remember any of the names of any of
23   the cashiers that joked around after you returned
24   from your surgery?
25           (The videographer entered the proceedings.)  12:02
```

Page 107

Exhibit A - Page 25

```
 1          MR. LIBMAN:  As promised, unexpected,
 2   finally, a videographer.
 3          MS. GRANT:  We're on the record.
 4          MR. LIBMAN:  Let the record reflect that we
 5   have a videographer that entered the room.        12:03
 6          THE WITNESS:  I don't remember the name right
 7   now.
 8   BY MS. GRANT:
 9      Q   Do you remember the names of any coworkers
10   who joked around after you returned from your     12:03
11   surgery?
12      A   I don't know that -- William -- Willy --
13   Willy, it could have been.  I don't remember the
14   last name.
15      Q   What was his first name, William or Willy?  12:03
16      A   Willy, I think.  I don't know exactly.
17      Q   What was Willy's function?
18      A   He was the -- the receiving department team
19   leader.
20          THE REPORTER:  "The receiving department"    12:03
21   what?
22          THE WITNESS:  Team leader.
23   BY MS. GRANT:
24      Q   Other than Willy, who else joked around after
25   you returned from your surgery?                    12:04
```

Page 108

```
1        A    Some members, customers.

2        Q    Which customers joked around after you

3   returned from your surgery?

4        A    I don't remember.

5        Q    Other than Willy, can you remember the name      12:04

6   of anybody else who joked around after you returned

7   from your surgery?

8        A    Not right now, I don't remember.

9        Q    How many times -- how many times did Willy

10   joke around after you returned from your surgery?      12:05

11       A    Maybe a couple of times.

12       Q    And to be clear, we're talking about when you

13   returned in 2013, in this series of events, correct?

14            MR. LIBMAN:  Objection; misstates testimony.

15            Go ahead.                                        12:05

16            THE WITNESS:  Yes.

17   BY MS. GRANT:

18       Q    Turning to the first time that Willy joked

19   around after you returned from surgery, what did

20   Willy say?                                                12:05

21       A    "Damn, Onier, you're slow."

22            MR. LIBMAN:  I'm sorry.  Say it again?

23            THE WITNESS:  "Damn, Onier" --

24            MR. LIBMAN:  Damn?  Damn?

25            THE WITNESS:  (No audible response.)             12:06
```

Page 109

Exhibit A - Page 27

```
 1        A    I don't remember, no, I don't.

 2        Q    I'm sorry?

 3        A    I don't remember.

 4        Q    And what did you say to Willy in that

 5   conversation?                                      12:07

 6        A    Don't remember.

 7        Q    Was anybody present for the conversation in

 8   which Willy said to you that it took you longer to

 9   do your work after you returned from leave in 2013?

10        A    Don't remember.  Don't remember.         12:07

11        Q    Did you tell anybody that Willy said to you

12   you're taking longer to do your work when you

13   returned from your surgery in 2013?

14        A    I didn't tell anybody.  I didn't tell

15   anybody.                                           12:08

16        Q    Do you know whether anybody else was aware

17   that Willy said to you, "Damn, Onier, you're slow"

18   after you returned from leave in 2013?

19             MR. LIBMAN:   Objection; calls for

20   speculation, lacks foundation.                     12:08

21             Can you read the question back, please.

22             (Record read as follows:

23                 "Do you know whether anybody else was

24             aware that Willy said to you, 'Damn,

25             Onier, you're slow' after you returned
```

Page 111

Exhibit A - Page 28

1        from leave in 2013?")

2        THE WITNESS:  I don't remember.

3   BY MS. GRANT:

4    Q    Do you know whether anybody else knows that

5   Willy said to you that you took longer to do your        12:08

6   work after you returned from your surgery in 2013?

7        MR. LIBMAN:  Objection; calls for

8   speculation, what people may know.

9        THE WITNESS:  I don't know.  I don't know.

10  BY MS. GRANT:                                             12:09

11   Q    Which supervisors made -- strike that.

12        Which supervisors joked around after you

13  returned from your surgery in 2013?

14   A    Marina joked around.  She made comments.  You

15  know, it was obvious I wasn't walking fast or            12:09

16  turning, so Marina -- I don't -- it could have been

17  other associates.  I don't remember their names.

18  Right now, I don't know -- it was obvious that --

19  that I wasn't walking fast.

20   Q    Other than Marina -- and when you say            12:10

21  "Marina," you mean Marina Aguilar?

22   A    Marina Aguilar.

23   Q    Other than Marina, did any other supervisors

24  joke around, as you put it, after you returned from

25  your surgery in 2013?                                     12:10

                                              Page 112

```
 1          MR. LIBMAN:   Objection; calls for speculation

 2    as phrased.

 3          THE WITNESS:   I don't remember all the names.

 4    BY MS. GRANT:

 5      Q    Pardon me?                                      12:10

 6      A    I don't remember.

 7      Q    You don't remember whether any supervisors

 8    other than Marina Aguilar joked around when you

 9    returned from your surgery in 2013?

10          MR. LIBMAN:   Objection; calls for speculation   12:10

11    as phrased.

12          THE WITNESS:   No.

13    BY MS. GRANT:

14      Q    I know that you said you don't remember the

15    names of any other associates other than Willy who     12:11

16    joked around after you returned from your surgery in

17    2013, but can you tell me the positions of any of

18    the associates who joked around after you returned

19    from your leave in 2013?

20      A    Most jokes came from the cashiers in the        12:11

21    front end.

22      Q    How many cashiers?

23      A    Almost anybody had a comment to the way that

24    I -- I walked.   There were like maybe ten cashiers

25    at a time.                                             12:11
```

Page 113

Exhibit A - Page 30

```
 1   BY MS. GRANT:
 2      Q   I'm asking you for a description of the first
 3   cashier who made the comment about your being slow
 4   when you returned from surgery.
 5      A   It could have been one of the supervisors,        12:13
 6   the front end, COS's.  I don't remember that.
 7          THE REPORTER:  The what?
 8          THE WITNESS:  The COS, the front end
 9   supervisor.
10   BY MS. GRANT:                                             12:13
11      Q   As you sit here today, can you recall the
12   description of any cashier who made a comment about
13   your being slow when you returned from leave in
14   2013?
15          MR. LIBMAN:  Objection; it's been asked and        12:13
16   answered, vague and ambiguous as to "description."
17          THE WITNESS:  I don't remember.
18   BY MS. GRANT:
19      Q   What was the next comment that any cashier
20   made after you returned from surgery in 2013?            12:14
21      A   We made comments about the procedure, the way
22   the procedure was handled and general things related
23   to the operation.
24      Q   But a cashier made a comment about how your
25   procedure was done?                                      12:14
```

Page 115

Exhibit A - Page 31

```
 1      A    We made comments about it.  When they talk
 2   about it, we made -- we talk about the subject.
 3      Q    So you and other cashiers talked about how
 4   the procedure -- your medical procedure was done?
 5      A    Yes.                                          12:14
 6      Q    And what did the cashiers say in the
 7   conversations about how your medical procedure was
 8   done?
 9      A    I remember -- I remember the -- that we made
10   comments some of these procedures could be seen      12:14
11   on -- on television or read in books, things like
12   that.
13      Q    Anything else?
14      A    No.
15      Q    When was your surgery in 2013?  Strike that. 12:15
16          You went on leave for the surgery that you
17   had prior to returning to work in 2013, correct?
18      A    I went on medical leave before the operation.
19      Q    And when was your medical leave?
20      A    I don't remember the date.  It could be      12:16
21   October.
22      Q    You went on medical leave in October of 2012?
23      A    2012?  Approximately.
24      Q    And when did you return from medical leave?
25      A    I think it was six weeks after.              12:16
```

Page 116

Exhibit A - Page 32

1    Q    And when you returned from medical leave, did

2    the doctor give you a note that indicated that you

3    had any restrictions on your ability to perform your

4    job duties?

5    A    I don't remember reading the paper that the    12:16

6    doctor gave me.  I just brought it to my human

7    resources person.

8    Q    Did any doctor tell you in 2013 when you

9    returned from leave -- strike that.

10        Did any doctor tell you, when you returned     12:17

11   from the leave that you began in October 2012, that

12   you had any medical restrictions to allow you to

13   perform the duties of your position?

14   A    They told --

15        MR. LIBMAN:  Objection, objection -- you know  12:17

16   what?  Strike that.

17        Go ahead.

18        THE WITNESS:  They told me that I had to be

19   careful in the way that I -- I turned.  It was -- I

20   had to -- I just had to be careful.                 12:17

21   BY MS. GRANT:

22   Q    Anything else?

23   A    Not that I remember.

24        I went to therapy.  They sent me to therapy.

25   Q    When did you go to physical therapy?          12:18

                                              Page 117

```
1       A    That was soon after the -- the -- they
2   removed my bandage and -- and swelling went away.
3   And I went there.
4       Q    You went to physical therapy while you were
5   still on leave?                                      12:18
6       A    Yes.
7       Q    When did your physical therapy begin?
8       A    It was just shortly after the operation,
9   maybe a couple of weeks or something.
10      Q    When you returned from your medical leave for   12:18
11  your knee surgery -- you had knee surgery, correct?
12      A    Yes.
13      Q    So when you returned from the medical leave
14  from your knee surgery in 2012, what was the first
15  comment that Marina Aguilar made that you considered   12:19
16  to be inappropriate?
17      A    We were talking, Marina and also the store
18  manager, Angela.  She made a comment.  Her brother
19  or some relative went through a similar procedure,
20  and they -- they were never recovered completely.      12:19
21          And we were joking around, you know -- you
22  know, "It will make you slow" and things like --
23  just talking about the situation.
24      Q    So what -- what was the first comment that
25  Marina Aguilar made when you returned from leave       12:20
```

                                        Page 118

Exhibit A - Page 34

```
 1   and --

 2          MR. LIBMAN:  Objection; it's been --

 3   BY MS. GRANT:

 4      Q   -- the leave that you took in 2012 for knee

 5   surgery -- strike that.                          12:20

 6          What was the first comment Marina Aguilar

 7   made that you considered inappropriate after you

 8   returned from leave for your 2012 knee surgery?

 9          MR. LIBMAN:  Objection; it has been asked and

10   answered.                                        12:20

11          Go ahead.

12          THE WITNESS:  We -- we -- we -- the comments

13   were that I was slow, that I didn't move the same

14   way.

15   BY MS. GRANT:                                     12:21

16      Q   Anything else?

17      A   That's what I remember.

18      Q   Do you remember anything else?

19      A   No.

20      Q   When was the first time after you returned  12:21

21   from the leave for your 2012 knee surgery that

22   Marina made a comment that you were slow?

23          MR. LIBMAN:  Objection; asked and answered.

24          THE WITNESS:  It could have been the first

25   week that I returned.  I don't remember the precise  12:21
```

Page 119

Exhibit A - Page 35

```
 1   date.
 2   BY MS. GRANT:
 3       Q    And when did Marina Aguilar make the comment
 4   that you don't move in the same way after you
 5   returned from leave related to your 2012 knee         12:21
 6   surgery?
 7            MR. LIBMAN:   Objection; it's been asked and
 8   answered.
 9            THE WITNESS:   The same time.
10   BY MS. GRANT:                                         12:22
11       Q    In the same conversation --
12       A    Yes.
13       Q    -- when she said that you were slow?
14       A    Yes.
15       Q    How many times did Marina Aguilar make a     12:22
16   comment about your being slow?
17       A    Maybe a couple of times.
18       Q    And how many times did she make a comment
19   about your being -- not moving the same way?
20       A    Maybe a couple of times.                     12:22
21       Q    So I know the first time that she said you
22   were slow and didn't move the same way, that they
23   occurred in the same conversation.
24            The second time that she said that you were
25   slow, was that in the same conversation that she      12:22
```

Page 120

Veritext Legal Solutions
866 299-5127

Exhibit A - Page 36

```
 1   also said you didn't move the same way?
 2        MR. LIBMAN:  Objection; argumentative,
 3   misstates the testimony.
 4   BY MS. GRANT:
 5      Q   Go ahead.  You can answer.              12:23
 6        MR. LIBMAN:  Go ahead and answer.
 7        THE WITNESS:  No.  That had to be on a
 8   separate occasion.
 9   BY MS. GRANT:
10      Q   So the first time she said you were slow and   12:23
11   didn't move the same way, it was in the same
12   conversation.  And subsequent to that, she said
13   you're slow and don't move the same way in two
14   separate conversations --
15        MR. LIBMAN:  Objection --                  12:23
16   BY MS. GRANT:
17      Q   -- correct?
18        MR. LIBMAN:  Objection; compound on multiple
19   levels, argumentative, misstates the testimony.
20   BY MS. GRANT:                                   12:23
21      Q   Correct?
22        MR. LIBMAN:  Go ahead and answer.
23        THE WITNESS:  Yes.
24   BY MS. GRANT:
25      Q   So the conversation that you had where she   12:23
```

Page 121

```
 1   said that you were slow -- this is the second time
 2   she said you were slow, when did that conversation
 3   occur?
 4      A   When I was by my register, when I was going
 5   to retrieve something from inside the cage.          12:23
 6      Q   Who else was present?
 7      A   I don't know.  I don't remember.  Maybe the
 8   member that I was helping, but I don't remember who
 9   it was.
10      Q   Did you tell anyone that Marina Aguilar had  12:24
11   made that comment about your being slow?
12          MR. LIBMAN:  Objection; other than your
13   attorneys.  May call for legal conclusion -- for
14   attorney-client privilege, vague as to time.
15   BY MS. GRANT:                                        12:24
16      Q   While you were employed at Sam's Club.
17      A   Can you repeat the question?
18      Q   While you were employed at Sam's Club, did
19   you tell anybody that Marina Aguilar told you that
20   you were slow?                                       12:25
21      A   I could have made comments at home with my
22   family.
23      Q   Anyone else?
24      A   Maybe friends, family.
25      Q   Anyone else?                                  12:25
```

Veritext Legal Solutions
866 299-5127

```
 1      A    No.

 2      Q    Which friends did you tell that Marina

 3  Aguilar had made the comment that you were slow

 4  after you returned from your 2012 surgery?

 5      A    General friends, like maybe my neighbors or      12:25

 6  something like that.

 7      Q    I'm asking you for names.

 8      A    I don't remember names.  I can't tell you.  I

 9  don't remember names.

10      Q    You don't remember the names of any of your      12:25

11  friends who you told that Marina Aguilar said that

12  you were slow after you returned from knee

13  surgery -- your 2012 knee surgery?

14      A    No, I don't remember -- I don't remember the

15  names.                                                     12:26

16      Q    Were you going to say something else?

17      A    I don't remember the names.

18      Q    And who were the family members that you told

19  that Marina Aguilar said that you were slow after

20  you returned from knee surgery?                            12:26

21          MR. LIBMAN:  Objection; misstates testimony.

22          Go ahead.

23          And argumentative as phrased.

24          THE WITNESS:  It could have been my parents

25  or my kids.                                                12:26
```

                                                       Page 123

```
 1      Q   Other than Angela Deo mentioning that she had

 2    a friend who had a similar type of surgery to you,

 3    who never recovered completely, did Angela say

 4    anything else related to you and your -- after you

 5    returned from leave, related to your surgery?        12:28

 6      A   No, no.

 7          MS. GRANT:  I'd like to mark as Exhibit 5

 8    Wal-Mart leave of absence packet, California, FMLA.

 9          (Exhibit 5 was marked for identification

10          by the court reporter and is attached hereto.)   12:29

11          MR. LIBMAN:  Is this the copy for me?  I take

12    that as a "yes"?

13          MS. GRANT:  That's where I've been putting

14    all of your copies, so I'm not sure -- which you

15    removed from that exact same spot, so I'm not sure    12:29

16    why there's a question as to whether that copy is

17    yours, because that literally is the same spot where

18    I put all of the copies that are your copies --

19          MR. LIBMAN:  And I did not see --

20          MS. GRANT:  And I've given you a copy of       12:30

21    every exhibit, and I've put it in that exact spot.

22          MR. LIBMAN:  I did not see you put it there,

23    and so I just asked the question if that was the

24    same document that you identified.  I assume that it

25    is, right?  Okay.  I will take that as a "yes."      12:30
```

Page 125

1          MS. GRANT:  Back on the record.

2          Mr. Vargas just indicated two seconds ago

3    that he's now finished reviewing Exhibit 5.

4      Q    Have you seen Exhibit 5 before?

5      A    It's possible.  I signed a paper.                    12:47

6      Q    Is that your signature on page 10 of

7    Exhibit 5?

8      A    Yes.

9      Q    And did you sign Exhibit 5 on or about --

10   strike that.                                                12:47

11         Do you see that there are two signatures on

12   page 10 of Exhibit 5?

13         MR. LIBMAN:  Objection; misstates the

14   document.

15         THE WITNESS:  What is the question with             12:48

16   Exhibit 5, page 10?

17   BY MS. GRANT:

18     Q    You signed -- you've signed -- there are two

19   signatures of your name on page 10 of Exhibit 5,

20   correct?                                                   12:48

21     A    Yes.

22     Q    Did you sign the one lower down in the page,

23   that signature, on or about October 1st, 2012?

24         MR. LIBMAN:  Objection; vague and ambiguous.

25         Go ahead.                                            12:48

                                                    Page 134

1       Mischaracterizes the document.

2       THE WITNESS:  Yes, it looks my signature --

3   it looks like my signature.

4   BY MS. GRANT:

5       Q    And where it says above where your signature       12:49

6   is and it says, "October 1st, 2012," above that, did

7   you write your name in that blank space, "Onier

8   Vargas"?  Is that -- okay.  So above where you have

9   your name printed, you see your signature,

10  correct --                                                   12:49

11      A    Yes.

12      Q    -- right above?

13      Now, above that, next to "November 17th,

14  2012," is that your signature there, too?

15      A    It appears to be my signature.                      12:49

16      Q    And was it your plan to return to work on

17  November 17th, 2012?

18      A    It's possible, yes.

19      Q    And did you complete this document, the

20  entirety of the parts that you wrote, before you             12:50

21  submitted it to the company?

22      MR. LIBMAN:  Objection; vague and ambiguous.

23      THE WITNESS:  I fill it up.  I don't remember

24  when I fill it up.  It's my -- it looks like my

25  writing.                                                     12:50

Page 135

```
 1    BY MS. GRANT:

 2        Q    Turning to page 5 of Exhibit 5, is that your

 3    signature?

 4        A    Yes.

 5        Q    And did you sign page 5 of Exhibit 5 on          12:57

 6    October 1st, 2012?

 7        A    It appears that I did.

 8        Q    Is there any reason you have to believe that

 9    you didn't sign page 5 of Exhibit 5 on October 1st,

10    2012?                                                    12:57

11        A    No.

12        Q    Turning to page 9 of Exhibit 5, putting aside

13    the typewritten parts and focusing only on the

14    handwriting, is there any handwriting on page 9 of

15    Exhibit 5 that is not your handwriting?                  12:58

16            MR. LIBMAN:  Or any markings of any kind that

17    is not in your handwriting, right, Counsel?

18            MS. GRANT:  No.  That's not what I asked

19    him --

20            MR. LIBMAN:  Only the handwriting.                12:58

21            MS. GRANT:  I'd like him to answer the

22    question that I asked.

23            MR. LIBMAN:  I'm just trying to make clear

24    what your question is.

25            THE WITNESS:  The "29," again, for sure, I       12:58
```

                                                      Page 140

```
 1   understanding and my name.
 2   BY MS. GRANT:
 3       Q   And had you completed page 9 of Exhibit 5
 4   when you turned it in to the company?
 5           MR. LIBMAN:  Objection; vague and ambiguous    01:00
 6   as to "completed."
 7           THE WITNESS:  I -- I think that -- maybe that
 8   human resources associate could have probably helped
 9   with some of the markings.
10   BY MS. GRANT:                                          01:00
11       Q   Did you request medical leave on or about
12   October 1st?
13       A   I requested medical leave just before my
14   operation, yes.
15       Q   Was that on or about October 1st of 2012?     01:00
16       A   It's possible.  I don't know the exact times,
17   but yeah, it's possible that that was the time.
18       Q   And was the medical leave that you requested
19   for your own medical condition?
20       A   Yes.                                          01:00
21       Q   Is there anything that's inaccurate in the
22   markings or handwriting on page 9 of Exhibit 5?
23           MR. LIBMAN:  Objection; may call for legal
24   conclusions and work product and attorney-client
25   privilege.                                             01:01
```

Page 142

```
 1    BY MS. GRANT:

 2        Q    Turn to page 12 of Exhibit 5.  Is that your

 3    signature by line 12 of the page where it says,

 4    "Signature of Employees"?

 5        A    It -- it appears to be my signature.          01:04

 6        Q    And did you sign page 12 of Exhibit 5 on or

 7    about October 2nd, 2012?

 8        A    It's possible, yes.

 9        Q    And was Martin Smietanka your doctor at that

10    time?                                                  01:05

11        A    Yes, it was my doctor.

12        Q    Was he your knee surgeon?

13        A    No.

14        Q    He was your general practitioner?

15        A    Yes.                                          01:05

16        Q    And did you give him this form to complete

17    for you?

18        A    I don't remember.

19        Q    Was your request for leave in October of 2012

20    approved?                                              01:05

21             MR. LIBMAN:  Objection; vague and ambiguous

22    as to whom.

23             THE WITNESS:  My request was approved.

24    BY MS. GRANT:

25        Q    How long after you requested leave was it     01:06
```

Page 145

```
 1   approved?

 2      A   I don't remember that.

 3         MS. GRANT:  I'd like to mark as Exhibit 6

 4   Return to Work/School, dated 11/15/2012 from

 5   Healthcare Partners.                              01:07

 6         (Exhibit 6 was marked for identification

 7          by the court reporter and is attached hereto.)

 8   BY MS. GRANT:

 9      Q   Have you seen Exhibit 6 before?

10         MR. LIBMAN:  Objection.  Let the record     01:09

11   reflect that Exhibit 6 is a minimized copy or

12   version of an exhibit that was provided -- disclosed

13   in discovery or additional disclosures of the

14   defendants and had a different orientation and font

15   size, just for the record.                        01:09

16         MS. GRANT:  Sorry, what are you saying?

17         MR. LIBMAN:  I already said it.

18         MS. GRANT:  You're saying that this has a

19   different font size than --

20         MR. LIBMAN:  The size, the copy that we have 01:09

21   appears to be enlarged, and this appears to be, I

22   guess, a minimized version of it.

23         So just for the record, it's not -- does not

24   appear identical to the copy that was produced to us

25   in the disclosure.  So that's all I'm stating, just 01:10
```

Page 146

```
 1    for the record.  That's what we got.
 2          MS. GRANT:  Let me see what you're talking
 3    about.
 4          MR. LIBMAN:  Well, you know, this is it.  My
 5    notes are in there, so I don't want you to --          01:10
 6          MS. GRANT:  I just want to see the document.
 7          MR. LIBMAN:  Healthcare Partners, do you see
 8    the orientation?  It's --
 9          MS. GRANT:  So you're saying that one is
10    landscape and one is not landscape?                    01:10
11          MR. LIBMAN:  And the font looks like it's
12    minimized, correct.
13    BY MS. GRANT:
14       Q   Can you read Exhibit 6?
15       A   Yes, I can read it.                              01:10
16       Q   Have you seen Exhibit 6 before?
17          MR. LIBMAN:  Subject to the same comment, for
18    the record, that I made.
19          THE WITNESS:  It is possible I -- yes, I've
20    seen it before.                                        01:10
21    BY MS. GRANT:
22       Q   Did you submit Exhibit 6 to Sam's Club?
23       A   I don't even remember who I submit it to.
24    But if it was given to me by the doctor, I -- and it
25    was intended for somebody, I did it.                   01:11
```

Page 147

```
 1      Q    So you don't remember whether you submitted
 2   Exhibit 6 to Sam's Club?
 3      A    I don't remember.
 4      Q    Do you have any reason to believe that you
 5   did not submit Exhibit 6 to Sam's Club?              01:11
 6      A    No, I don't have any reason.  I just don't
 7   remember.
 8         MS. GRANT:   Let the record reflect that
 9   counsel put his arm -- his hand on his client's arm
10   and signaled to him after the deponent said that he   01:11
11   didn't remember.
12         MR. LIBMAN:   Objection; mischaracterizes what
13   happened.
14         MS. GRANT:   Did you --
15         MR. LIBMAN:   I'm just putting that on the     01:12
16   record --
17         MS. GRANT:   You put your hand on his arm.
18         MR. LIBMAN:   I'm not going to even respond to
19   it.
20         MS. GRANT:   Ms. Court Reporter, I'm sorry to  01:12
21   make this job so hard for you today.  I really -- I
22   know you have a very difficult job, and I don't want
23   to -- you know, it to be any more difficult than it
24   has to be.
25         To the extent that you can, could you please   01:12
```

Page 148

```
 1          MS. GRANT:  Okay.  So you're not seeking any
 2     damages for after he left Sam's Club?
 3          MR. LIBMAN:  That's not -- that's --
 4          MS. GRANT:  Okay.  Well, I'm going to move to
 5     exclude any damages you are seeking because you're    02:16
 6     not allowing me to question him.
 7          MR. LIBMAN:  You can move.  I think it's not
 8     relevant.
 9          MS. GRANT:  Okay.  All right.
10          MR. LIBMAN:  The objection is it's overbroad.   02:16
11          MS. GRANT:  You've -- you've stated your
12     motion -- your objection, and I've made my position
13     clear, and so --
14          MR. LIBMAN:  Understood.
15          MS. GRANT:  -- you won't -- you won't be        02:16
16     surprised when you see my motion.
17          I'd like to mark as Exhibit 7 a Healthcare
18     Partners Medical Group physical therapy referral,
19     dated October 18th, 2012.
20          (Exhibit 7 was marked for identification        02:17
21          by the court reporter and is attached hereto.)
22          MR. LIBMAN:  One moment.  This is Exhibit 7?
23          THE REPORTER:  Correct.
24          MR. LIBMAN:  Okay.  I don't see it
25     Bates-stamped anywhere, so this was not part of any   02:18
```

Page 154

```
 1    documents produced by defendants subject to their
 2    initial disclosure or -- or subsequently as they
 3    were required, then I'm objecting to the use of this
 4    document.
 5         And, in fact, if it's a medical record, then      02:18
 6    it may not have been properly obtained and possibly
 7    in violation of privacy and HIPAA rights.
 8         Because I just don't see a Bates stamp, I
 9    have to reserve all these objections on the record.
10    BY MS. GRANT:                                          02:18
11         Q   Have you seen this document before?
12         A   I don't know if it was on exactly document.
13    I remember seeing something that referred me to the
14    physical therapy.
15         Q   And did you take physical therapy between     02:19
16    October 17th, 2012 and January 16th of 2013?
17         A   Yes.
18         Q   How many times a week did you take physical
19    therapy?
20         A   I'm not sure if it was once or twice a week.  02:19
21         Q   When was the first time you took physical
22    therapy?
23         A   I don't remember the -- the date.  I remember
24    it was after they removed the wound covering --
25    wrap, and my swelling went down.  No, I don't         02:20
```

                                                      Page 155

1    remember the time.

2        Q    Do you remember when your physical therapy

3    ended in relation to your October 2012 surgery?

4        A    No, I don't remember the date.

5        Q    If you can turn to the second page of          02:20

6    Exhibit 7.  Do you see at the top that this page is

7    dated October 31st, 2012?

8        A    At the top of the letter?  Yes, October 31st,

9    2012.

10       Q    Do you know why you had another form          02:21

11   completed for later -- a later expiration date than

12   your initial form dated October the 18th, 2012?

13       MR. LIBMAN:  Objection; assumes facts not in

14   evidence, it calls for speculation, lacks

15   foundation, misstates the document and the evidence.  02:21

16       THE WITNESS:  I don't know why.

17   BY MS. GRANT:

18       Q    Do you recall initially being referred to

19   physical therapy?

20       A    I do.                                           02:21

21       Q    You said you do?

22       A    Yes.

23       Q    Do you recall that your time frame for

24   physical therapy was extended to make it a later end

25   date on the referral?                                   02:22

Page 156

1          MR. LIBMAN:  All I said was I didn't see the

2    Bates stamp, so I preserved the objection and just

3    noted it for the record.  Simple as that.

4          MS. GRANT:  I'd like to mark as Exhibit 8

5    physical -- strike that, routine created by Natalie        02:24

6    Lopez, hip/knee extension, dated November 5th, 2012.

7          (Exhibit 8 was marked for identification

8        by the court reporter and is attached hereto.)

9    BY MS. GRANT:

10       Q   Have you seen Exhibit 8 before?                     02:25

11       A   I've seen a similar exercise or -- or therapy

12   exercises.  Yes, I have.

13       Q   Have you seen this particular document

14   before?

15       A   It looks very familiar, yes.                        02:25

16       Q   And where do you recall receiving this

17   document?

18          MR. LIBMAN:  Objection.

19          Other than anything -- anything that was

20   communicated to you by my office or through                 02:25

21   conversations and counseling we had prior to the --

22   today's deposition.

23          MS. GRANT:  Strike that question.

24       Q   When do you recall receiving this document?

25       A   This --                                             02:26

                                              Page 158

```
 1          MR. LIBMAN:  Again, subject to the objection
 2   of anything that includes or may, include in your
 3   answer, the time frame we're in that involved any
 4   discussions with my office, you should exclude any
 5   of that time frame.  Anything else, you're free to        02:26
 6   answer.
 7          THE WITNESS:  This document, they could have
 8   given it to me in one of my appointments with a
 9   therapist.
10   BY MS. GRANT:                                             02:26
11      Q   Do you believe, as you sit here today, that
12   you received this document during your physical
13   therapy appointment?
14      A   I'm sorry.  Can you repeat the question.
15          MS. GRANT:  Sure.  Let's have the court           02:26
16   reporter read it back.
17          Would you please repeat the question.
18          THE REPORTER:  Sure.
19          MS. GRANT:  Thanks.
20          (Record read as follows:
21           "Do you believe, as you sit here today,
22            that you received this document during
23            your physical therapy appointment?")
24          THE WITNESS:  I do.
25   BY MS. GRANT:                                             02:27
```

                                                        Page 159

```
 1        Go ahead.
 2        THE WITNESS:  My appointments varied based on
 3   their availability.
 4   BY MS. GRANT:
 5     Q   So when you were having your physical therapy   02:31
 6   appointments related to your October 2012 knee
 7   surgery, what is your best recollection of whether
 8   you -- your appointments were generally in the
 9   morning, afternoon or evening?
10        MR. LIBMAN:  Objection; misstates the            02:31
11   testimony and argumentative.
12        Go ahead.
13        THE WITNESS:  It could have been more in the
14   afternoon.
15   BY MS. GRANT:                                         02:32
16     Q   What shift did you work immediately prior to
17   going on medical leave in October of 2012?
18     A   My -- my schedule at the company was mostly
19   in the mornings.  Only on a special occasions we
20   work evenings.                                        02:32
21     Q   So what was the start of your shift time
22   immediately preceding going on your medical leave in
23   October 2012?
24     A   There was a day that I work from 4:00 in the
25   morning until 12:30, I think it was.  That was when   02:32
```

Page 162

```
 1   I conducted inventories.  And remaining days, it was
 2   from 6:00 in the morning until 2:30.
 3      Q   And the day you conducted inventory and
 4   started at 4:00 a.m. and went to 12:30, was that
 5   12:30 p.m. or 12:30 a.m.?                               02:33
 6      A   12:30 p.m.
 7      Q   And prior to going on medical leave in
 8   October 2012, how long had you been working the
 9   6:00 a.m. to 2:30 p.m. shift?
10      A   That was the majority of my -- my years with  02:35
11   the company.
12      Q   So at least five years?
13      A   Yes.
14      Q   And how many times in those five years did
15   you work a shift other than 6:00 a.m. to 2:30 p.m.?    02:36
16      A   The company conducted general inventories
17   every six months.  So every six months, we had to
18   work like from midnight until somewhere in the
19   morning, eight hours' shift.  So every six months,
20   they change.                                           02:36
21      Q   Okay.  Let me just see if I have this
22   straight.
23          So every six months, you would work from
24   midnight for eight -- an eight-and-a-half-hour
25   shift?                                                 02:37
```

Page 163

Exhibit A - Page 55

```
 1      A    Every six months, yes.

 2      Q    And then how -- and this was during the five

 3   years immediately pre- -- immediately preceding your

 4   October 2012 medical leave, correct?

 5      A    Inventories were conducted every six months,      02:37

 6   and they -- they fall in certain dates.  I don't

 7   remember the -- the day that the -- the last

 8   inventory fall into.  I don't remember that date.

 9      Q    No, and that's fine.  That's not what I'm

10   asking you, so let me just clarify what I'm asking        02:37

11   you.

12         We started out by talking about the five

13   years preceding your going on leave in October 2012,

14   and so I'm just trying to figure out the shifts that

15   you were working during those five years.                 02:37

16         So during those five years, every six months,

17   you would work from midnight for an eight-and-a-

18   half-hour shift to do general inventory, correct?

19      A    Not eight and a half hours.  It's eight

20   hours.                                                    02:38

21      Q    Okay.  Eight hours.  I'm sorry.

22         So you would work an eight-hour shift from

23   midnight every six months to do general inventory,

24   correct?

25      A    Yes.                                              02:38

                                                 Page 164
```

```
 1      Q    Okay.  And then you also said that sometimes

 2   you conducted inventory from 4:00 a.m. to 12:30 p.m.?

 3      A    Those were done once a week.

 4      Q    Once a week.  Okay.  Thank you.

 5           And were those inventories done on a            02:38

 6   particular day of the week?

 7      A    Yes.

 8      Q    What day of the week were those?

 9      A    I believe it was done on Thursdays.  It had

10   to be done after our shipment days, which I think      02:38

11   were Mondays and Wednesdays.

12      Q    Okay.  So every Thursday in the five years

13   preceding your going on medical leave in October

14   2012, did you work from 4:00 a.m. to 12:30 p.m.?

15      A    Yes, I did.                                     02:39

16      Q    And did you have the same days off every week

17   in the period of time, the five years preceding your

18   going out on leave in 2012?

19           MR. LIBMAN:  Objection; vague and ambiguous

20   as to "same days off."                                 02:39

21           THE WITNESS:  The most part, it was the same

22   days.  It slightly changed from time to time.

23   BY MS. GRANT:

24      Q    Generally, what were your days off during the

25   five years preceding your going on medical leave in    02:39
```

Page 165

```
 1    October 2012?
 2          MR. LIBMAN:   Objection; overbroad, too
 3    general.
 4          THE WITNESS:   The -- my days off, I think,
 5    were Tuesdays, I think.   And I know certainly      02:40
 6    Sundays, they -- they didn't want me to work, so I
 7    had Tuesdays and Sundays.
 8    BY MS. GRANT:
 9       Q    Can you remember any weeks in the five years
10    preceding your October 2012 leave where you did not  02:40
11    have Tuesday and Sunday off?
12       A    No, I don't remember that.
13       Q    So on the days that you were working in the
14    five years preceding your medical leave in
15    October 2012 where you weren't conducting general    02:40
16    inventory from midnight for an eight-hour shift and
17    were not working from 4:00 a.m. to 12:30 p.m. on
18    Thursdays for the weekly inventory, did you work
19    6:00 a.m. to 2:30 p.m.?
20       A    The -- the remaining days I worked, it was    02:41
21    from 6:00 in the morning to 2:30.
22       Q    So in the five years -- strike that.
23          So when you said that you worked an
24    eight-hour shift starting at midnight, did you work
25    from midnight to 8:00 a.m.?                          02:41
```

Page 166

```
 1      A    I -- the number of eight hours, whatever that
 2   is from -- from midnight until eight-hour shift.
 3      Q    Did the eight hours include a meal break such
 4   that it was -- you were -- it was an eight-and-a-
 5   half-hour-shift with a half-hour for a meal break,      02:42
 6   or are you saying that the meal break came off of
 7   the eight hours?
 8      A    It was eight-and-a-half -- it was -- the meal
 9   was -- we had -- it wasn't given.  It was what we
10   had to state.                                            02:42
11      Q    So you worked from -- on the -- every six
12   months when you did the general inventory, you
13   worked from midnight to 8:30 a.m., correct?
14      A    That's about right.
15      Q    And when you say "that's about right," is        02:42
16   there something wrong with what I just said or -- I
17   shouldn't say wrong -- or inaccurate about what I
18   just said?
19      A    Sometimes they could have probably changed
20   it.  Instead of midnight, they could have probably      02:43
21   changed it 11:00 in the evening until the
22   eight-hour, or sometimes they did it from midnight
23   to the eight-hour shift.
24           That was depending on the -- the rest of the
25   inventory crew.  I'm pretty sure there were other       02:43
```

Page 167

```
 1    factors.  So sometimes they changed it from midnight

 2    to 11:00 in the evening.  Sometimes 12:00.

 3        Q   So sometimes instead of starting at midnight,

 4    it would start at 11:00 p.m., and then the shift

 5    would end at 7:30 p.m.?                                    02:43

 6        A   Yes.

 7            MR. LIBMAN:  Objection; misstates testimony.

 8            MS. GRANT:  Sorry.  Strike that.

 9        Q   They would start the shift at 11:00 p.m., and

10    the -- would the shift end at 7:30 a.m. if the shift       02:44

11    started at 11:00 p.m.?

12        A   The eight hours -- if that was the eight

13    hours, yes.

14        Q   And so when you say it's an eight-hour shift,

15    again, like when you testified a few minutes ago,          02:44

16    it's eight hours not including the meal period,

17    correct?

18        A   The eight-hour -- no, not including the meal.

19        Q   So, for example, if you started at

20    11:00 p.m., you would end at 7:30 a.m., not                02:44

21    7:00 a.m., correct?

22            MR. LIBMAN:  Objection; vague and ambiguous

23    as to time, too general, overbroad.

24            THE WITNESS:  Yeah, that's -- I believe it's

25    right.                                                     02:44
```

                                                    Page 168

1      Q    You can complete your answer.

2      A    I don't remember.

3      Q    So as you sit here today, you don't have a

4   specific recollection of working more than eight

5   hours on any day preceding October 2012 medical        02:48

6   leave?

7           MR. LIBMAN:   Objection; calls for legal

8   conclusions as phrased.

9           THE WITNESS:   No, I don't remember.

10  BY MS. GRANT:                                           02:48

11     Q    Turning to the period of time where you came

12  back from medical leave, did your shift change from

13  what it was prior to going on medical leave in

14  October 2012?

15     A    No, I don't think so.                           02:49

16     Q    So as you sit here today, do you have any

17  specific recollection of working more than eight

18  hours on any day after you returned from your

19  medical leave due to your October surgery,

20  October 2012 surgery?                                   02:49

21          MR. LIBMAN:   Objection; again, calls for

22  legal conclusions and opinions.

23          Respond to the best of your ability from your

24  own personal knowledge.

25          THE WITNESS:   No, I don't remember working     02:49

                                              Page 171

1    more than eight hours.

2    BY MS. GRANT:

3        Q    After you returned from medical leave related

4    to your October 2012 surgery, when you were taking

5    physical therapy, did any of your appointments occur    02:50

6    during the day?

7        A    It's possible.

8        Q    After you returned from medical leave, did

9    any of your physical therapy appointments occur

10   during your scheduled shift?                            02:51

11       MR. LIBMAN:   Objection; calls for a legal

12   conclusion as to "your shift," argumentative as

13   phrased.

14       THE WITNESS:   I -- we usually worked the

15   schedules on a different -- on a day that I -- I        02:51

16   didn't have to work or on hours that I wasn't

17   required to work.

18       MS. GRANT:   I'm sorry, could you repeat his

19   answer.

20       (Record read as follows:

21         "I -- we usually worked the

22         schedules on a different -- on a day

23         that I didn't have to work or on

24         hours that I wasn't required to

25         work.")                                           02:52

                                                    Page 172

```
 1      A    No.   Why -- me -- me -- why would I say "we"?

 2           My appointments were on the day that I didn't

 3   have to work or on hours that I wasn't required to

 4   work.

 5      Q    And who chose the time of your physical      02:53

 6   therapy appointments?

 7      A    At that time, it was -- when I called to

 8   schedule the appointment, it was given to me the --

 9   the open times available.   And we worked around

10   the -- the availability.                             02:53

11      Q    So the physical therapy team and you selected

12   your appointment times for physical therapy?

13      A    Yes.

14      Q    And did anybody else have any involvement in

15   the times that you selected for physical therapy?     02:54

16           MR. LIBMAN:   Objection; calls for speculation

17   as phrased.

18           THE WITNESS:   No.

19   BY MS. GRANT:

20      Q    Did you get any direction from anybody at      02:54

21   Sam's Club as to what time you should schedule your

22   physical therapy appointments?

23      A    I don't recall.

24           MS. GRANT:   I'd like to mark as Exhibit 9 a

25   November -- strike that, December 15th, 2012 note     02:55
```

Page 174

Exhibit A - Page 63

```
 1    doctor tell you that you required any additional

 2    leave?

 3       A    No, I don't -- I don't remember.

 4       Q    After you returned from medical leave related

 5    to your October 2012 surgery, did any doctor          03:00

 6    recommend to you that you take additional leave?

 7       A    No, I don't remember.

 8       Q    After you returned from medical leave in --

 9    strike that.

10            After you returned from medical leave related  03:00

11    to your October 2012 surgery, did you request any

12    additional medical leave?

13            MR. LIBMAN:  Objection; vague and ambiguous

14    as to from whom.

15            THE WITNESS:  I could have.  I don't           03:01

16    remember.

17    BY MS. GRANT:

18       Q    Did you return from medical leave on October

19    the 19th, 2012?  Strike that.

20            Did you return from medical leave on November  03:01

21    the 19th, 2012?

22       A    Yeah.  November sounds more like the time.

23       Q    Was it November 19th?

24       A    I believe so.

25       Q    Well, looking at Exhibit 9, do you see that    03:01
```

                                                   Page 177

```
 1      A    Yes, I see it.

 2      Q    So based on Exhibit 6 and Exhibit 9, do you

 3   have any reason to believe that your return to work

 4   date was not November 19th, 2012?

 5      A    I don't know what day was the 19th.  I don't      03:04

 6   know if it was Saturday or Sunday.  That's the date

 7   that is on the paper, but I don't know if we can

 8   look at a calendar.

 9          And if it was on a weekend, maybe I not

10   necessarily started that day, but I could have         03:04

11   returned my paperwork on that day.  I brought the

12   paper to the office, and I don't remember exactly

13   what date it was.

14          So it could be that I started that same day,

15   or maybe I could have started, depending on the day   03:04

16   of the week, soon after, a couple of days, maybe a

17   day or two after, depending what day it was November

18   the 19th.

19      Q    Okay.  So, for example, if November 19th was

20   a Sunday and Sunday was your scheduled day off, you   03:04

21   may not have returned on that exact day, correct?

22      A    That -- yes.

23      Q    So you returned to work on or about

24   November 19th, 2012, correct?

25      A    Yes.                                            03:05
```

Page 179

```
 1      Q    I'm done with those, so you can put those
 2   down.   You can have them in your hand if you want
 3   to.   I'm just letting you know you don't have to --
 4      A    She says not to take them.
 5      Q    No, no, you definitely can't take them, but I      03:05
 6   was just letting you know you can release them --
 7      A    Oh, thank you.
 8      Q    -- and put them on the table if you wanted
 9   to.
10      A    Thank you.                                          03:05
11      Q    Other than physical therapy and knee
12   exercises, did any healthcare provider recommend
13   that you do anything else related to your
14   October 2012 knee surgery after you returned to
15   work?                                                       03:06
16      A    No.
17      Q    Was your physical therapy helpful, as far as
18   you're concerned, that you had after your
19   October 2012 knee surgery?
20      A    Yes.                                                03:06
21      Q    Did it help you heal, the physical therapy?
22           MR. LIBMAN:   Vague and ambiguous, overbroad
23   as to "heal."   May call for medical conclusions or
24   medical opinions.
25           THE WITNESS:   It helped me recover my             03:07
```

Page 180

```
 1    mobility.

 2    BY MS. GRANT:

 3        Q    Other than your mobility, did you believe

 4    that you had any other residual issues after you had

 5    surgery in October 2012?                              03:07

 6        A    I -- I was explained that inside the -- the

 7    wound, when it heals, it -- it has a -- a thicker

 8    texture or something like that, that it -- it will

 9    bother, so -- in the inside part.

10        Q    So on the inside of your knee, it bothered   03:08

11    you sometimes?

12             MR. LIBMAN:   Objection; misstates testimony.

13             THE WITNESS:   The inside part, I -- I have a

14    scar.  And the scar, it will always create a -- some

15    level of discomfort.                                  03:08

16    BY MS. GRANT:

17        Q    So do you still have some level of discomfort

18    relating to the scar?

19        A    I do.

20        Q    Has the level of discomfort changed at all?  03:08

21        A    No.

22        Q    So in 2017, is the level of discomfort

23    related to the scar the same as in 2016?

24        A    I still feel discomfort, yes.

25        Q    And in 2016, is the level of discomfort      03:09
```

Page 181

```
 1    related to the scar the same as 2015?

 2        A    Yes.

 3        Q    And in 2015, was the level of discomfort

 4    related to the scar the same as 2014?

 5        A    It could be probably worse.            03:09

 6        Q    It was worse in 2015 or in 2014?

 7        A    In the early stages.

 8        Q    In 2014, it was worse than 2015?

 9        A    Yes.

10        Q    And was 2013 worse than 2014?          03:09

11        A    2013 was, yes.

12        Q    And did the doctor give you any treatment for

13    your discomfort relating to the scar?

14        A    He explained me a way that I can help me.  He

15    explained me a way that I can help the -- the scar   03:10

16    not to bother too much.

17        Q    And what was that?

18        A    Massage it with my thumb, each -- each of

19    the -- each of the scar, because there's three

20    incisions, so each incision has a scar.  So they    03:10

21    explain me how to massage it with my thumb, and I --

22    I still do it.

23        Q    And did he explain anything else, other than

24    massaging it with your thumb, that would help the

25    discomfort from the scar?                           03:11

                                            Page 182
```

1    A    Yes.   They -- they -- they suggested icing my

2    knees after every physical activity for no more

3    than -- I think it's 15 minutes.

4    Q    You're supposed to ice it for no more than

5    15 minutes?                                                    03:11

6    A    Yes.

7    Q    And when did the doctor tell you that?

8    A    During my visits to the doctor.

9    Q    During which visits to the doctor did the

10   doctor tell you about icing your knee?                        03:12

11   A    They do a -- after the operation, they do

12   a -- like two or three, I think, follow-ups.  So in

13   those follow-ups, they -- they gave me tips or

14   suggestions to help me.

15   Q    So in your two to three follow-up              03:12

16   appointments, other than telling you to ice your

17   knee, is that when they also -- strike that.

18        In your two to three follow-up appointments

19   after your surgery, is that the same time where they

20   suggested the massaging the knee with your thumb?    03:12

21   A    Yes.

22   Q    And did they suggest massaging your knee with

23   your thumb after those two to three follow-up

24   visits?

25   A    Can you please repeat that.                    03:13

                                                  Page 183

```
 1              (Record read as follows:

 2                "And did they suggest massaging your knee

 3                with your thumb after those two to three

 4                follow-up visits?")

 5              THE WITNESS:  Yes.                              03:13

 6      BY MS. GRANT:

 7         Q    After the two to three follow-up visits

 8      relating to your knee surgery, did you see your knee

 9      surgeon?

10         A    I don't remember.                              03:13

11         Q    And when you say "they suggested" in the two

12      to three follow-up visits, who's the "they" to which

13      you're referring?

14              MR. LIBMAN:  Excuse me.

15              THE WITNESS:  Bless you.                        03:13

16              MS. GRANT:  Bless you.

17              MR. LIBMAN:  Thank you.

18              THE WITNESS:  That was the doctor that

19      conducted the -- the procedure.

20      BY MS. GRANT:                                          03:14

21         Q    And who was the doctor who conducted the

22      procedure?

23         A    I don't remember the name.

24         Q    Do you remember the medical group?

25         A    Yes.  The medical -- the medical group is     03:14
```

Page 184

```
 1   Health Net Partners.
 2      Q    Health Net Partners or Healthcare Partners?
 3      A    Oh, Healthcare?  I'm not sure.  I don't know
 4   if it's Health Net or Healthcare.  I don't know.
 5   Sorry.                                               03:14
 6      Q    So let's look at Exhibit 6 that's right there
 7   in front of you.  Do you see where it says,
 8   "Healthcare Partners" --
 9      A    It says "Healthcare," yes.  It's Healthcare.
10      Q    Is that the group to which your knee surgeon   03:14
11   belongs?
12      A    Yes.
13      Q    And as far as you're aware, did your knee
14   surgeon sign Exhibit 6?
15           MR. LIBMAN:  Objection; that calls for         03:15
16   speculation, lacks foundation.
17           Give me just a second to get a tissue.
18           THE WITNESS:  I don't know who signed it.
19   BY MS. GRANT:
20      Q    As far as you're aware, was it somebody from   03:15
21   Healthcare Partners who signed Exhibit 6?
22           MR. LIBMAN:  Objection; it calls for
23   speculation, lacks speculation.
24           THE WITNESS:  It had to be.
25   BY MS. GRANT:                                          03:15
```

Page 185

1      Q    When was your last follow-up visit with your

2   knee surgeon?

3      A    I do not remember that date.

4      Q    Do you remember the year?

5      A    My last one?  Could have been 2013.          03:16

6      Q    Do you remember what month?

7      A    No.

8      Q    After you completed physical therapy, did you

9   go back and see anyone at Healthcare Partners?

10     A    I could have.                                 03:16

11     Q    You don't remember, though?

12     A    I don't remember.

13     Q    If you wanted to remember the last time you

14  saw your knee surgeon or refresh your recollection

15  as to the last time you saw your knee surgeon, is    03:17

16  there any particular document you would look at?

17        MR. LIBMAN:  Objection; that calls for

18  speculation.

19        THE WITNESS:  I don't know what document.

20  BY MS. GRANT:                                         03:17

21     Q    How did you keep track of your doctors'

22  appointments?

23     A    They gave me a little card to -- like a

24  business card.  They write the date for my

25  appointment.                                          03:17

Page 186

```
 1        A    No.

 2        Q    Other than the conversations that you had

 3   with Marina Aguilar in which she said that you were

 4   slow and didn't move as quickly and the conversation

 5   in which Angela Deo said that one of her friends had     03:20

 6   a similar knee surgery and never fully recovered,

 7   did you have any other conversations with Marina or

 8   Angela related to your knee?

 9        MR. LIBMAN:   Objection; misstates the prior

10   testimony.                                                03:20

11        THE WITNESS:   No.

12   BY MS. GRANT:

13        Q    Did you ask anybody at Sam's Club for any

14   accommodations to do your work after you returned

15   from medical leave in October -- strike that, in         03:21

16   November of 2012?

17        MR. LIBMAN:   Objection; calls for legal

18   opinions and conclusions as to "accommodations."

19        THE WITNESS:   I could have mentioned it to

20   one of the managers.                                      03:21

21   BY MS. GRANT:

22        Q    I'm sorry.   I couldn't hear you.   You would

23   imagine?

24        A    Yes, I could have talked to them about

25   accommodations.                                           03:21

                                              Page 188
```

```
 1      Q    You could have?

 2      A    I could have.

 3      Q    Did you?

 4      A    I -- I possibly did.

 5      Q    Do you have a specific recollection of that      03:21

 6   conversation?

 7      A    Making comments like informal talks, we could

 8   have brought up the -- the fact that I could have

 9   probably used a chair or something.

10      Q    Do you have a specific recollection of          03:21

11   bringing that up?

12      A    It was just one of the times she stopped by

13   and I was standing by the register that we could

14   have talked about something like that.

15      Q    But do you have a specific recollection of      03:22

16   actually --

17      A    I --

18           MR. LIBMAN:  Please allow counsel --

19           MS. GRANT:  So you're putting your hand up so

20   you can -- I assume because your client was speaking   03:22

21   over me?

22           MR. LIBMAN:  Yes.  I wanted to just admonish

23   him to allow you to finish the question before he --

24           THE WITNESS:  Sorry about that.

25           MR. LIBMAN:  No, it's okay.  Everybody does    03:22
```

Page 189

```
 1    that -- before you begin responding.

 2    BY MS. GRANT:

 3        Q    So do you have a specific recollection of

 4    asking somebody for a chair?

 5        A    Yes.                                          03:22

 6        Q    When was that?

 7        A    In one of the occasions when Marina got by --

 8    by the area, she used to walk around the area, stop

 9    by just to see how was -- how were things.

10        Q    Did you ever sit on a chair during the entire  03:23

11    time you were tobacco cashier?

12            MR. LIBMAN:  Objection; vague and ambiguous

13    and way overbroad.

14    BY MS. GRANT:

15        Q    While performing your duties.               03:23

16            MR. LIBMAN:  Same objections.

17            THE WITNESS:  I could have sat on a flatbed

18    maybe once or twice.  I don't know.  I think I

19    probably did it once or twice maybe.

20    BY MS. GRANT:                                         03:23

21        Q    By "flatbed," is that some sort of chair?

22        A    Those are shopping carts that are used to

23    load up heavier merchandise, like cases of water or

24    soda.  We call them flatbeds.  It has four wheels

25    and has a handle that you can push.  And it's        03:24
```

                                        Page 190

```
 1    about -- low.
 2       Q    And so on occasion, while you worked at Sam's
 3    Club, while you were a tobacco cashier, you
 4    sometimes sat on this flatbed while you were at
 5    work?                                              03:24
 6       A    I -- I -- I did a couple of times.  I did
 7    probably, yeah.
 8       Q    And was that before you went on medical leave
 9    in October 2012?
10       A    Before I went on --                        03:24
11          MR. LIBMAN:  Objection; vague, overbroad.
12          THE WITNESS:  No, that wasn't before.  That
13    could be maybe after.
14    BY MS. GRANT:
15       Q    So after you came back from medical leave,  03:24
16    you sat on one of those flatbeds a couple of times?
17          MR. LIBMAN:  Objection; misstates testimony
18    and argumentative.
19          THE WITNESS:  Yeah, maybe a couple -- yes.
20    BY MS. GRANT:                                       03:25
21       Q    After you returned from medical leave in
22    2012, did you tell any healthcare provider that you
23    were having any trouble performing your duties at
24    work?
25       A    I could have.  I -- I don't remember.       03:25
```

Page 191

```
 1      Q    What month after you returned from leave in
 2   November 2012 did you mention sitting on a chair at
 3   work to Marina Aguilar?
 4           MR. LIBMAN:  Objection -- strike that.
 5           I think it misstates the testimony as          03:26
 6   phrased, if I understand correctly, because of
 7   the --
 8           MS. GRANT:  You don't need to make a speaking
 9   objection.  "Misstates the testimony as phrased" is
10   fine.                                                   03:26
11           Any other objections?
12           MR. LIBMAN:  I wanted just to help you
13   clarify the question.  But go ahead, that's fine.
14   Stand on the record.
15           MS. GRANT:  Okay.  Thank you.                   03:26
16           THE WITNESS:  What is the question?  May I,
17   please.
18           (Record read as follows:
19              "What month after you returned from leave
20              in November 2012 did you mention sitting
21              on a chair at work to Marina Aguilar?")
22           THE WITNESS:  It could have been just weeks
23   after.  Maybe if it was in November I returned,
24   maybe around the same month.
25   BY MS. GRANT:                                           03:26
```

                                              Page 192

Exhibit A - Page 77

```
 1      Q    And was it just one conversation in which you
 2   mentioned that to her?
 3      A    I remember for sure the one.
 4      Q    And you don't remember any others right now?
 5      A    No.                                          03:27
 6      Q    And what was Marina's response to you when
 7   you mentioned the chair to her?
 8      A    I don't know if she was like -- I think she
 9   probably said, "Get out of here," like -- like
10   joking, the -- I was bringing something that         03:27
11   wouldn't make -- didn't make sense.
12      Q    Her response was, "Get out of here"?
13      A    Something like that.
14      Q    In a joking manner?
15      A    Yes.                                          03:27
16      Q    Did she say anything else?
17      A    I could have -- I don't remember.  I could
18   have said something back, but I don't remember.
19      Q    Did she say anything else in that
20   conversation?                                         03:28
21      A    Marina and I talked many times.  I don't
22   remember.
23      Q    Did anybody ever sit on a chair while they're
24   performing cashier duties --
25           MR. LIBMAN:  Objection; calls for spec- --    03:28

                                          Page 193
```

```
 1    that.
 2          When you sat on the flatbed after you
 3    returned from leave in November 2012, did it create
 4    a problem for anybody at Sam's Club --
 5          MR. LIBMAN:  Object- --                         03:30
 6    BY MS. GRANT:
 7      Q   -- as far as you're aware?
 8          MR. LIBMAN:  Objection; calls for
 9    speculation, lacks foundation.
10          THE WITNESS:  I don't -- I don't think         03:30
11    they -- I don't think they seen me doing it, so I
12    don't think it caused any problem.
13    BY MS. GRANT:
14      Q   Where in Sam's Club did you physically work?
15          MR. LIBMAN:  Objection --                      03:30
16    BY MS. GRANT:
17      Q   And let's look at after October/November 2012
18    when you returned from leave.
19      A   The tobacco cage area is located closer to
20    the -- to the pharmacy and warehouse in -- in one of  03:31
21    the corners of the building in the front part.
22      Q   Customers could come up to you and purchase
23    tobacco products from you?
24      A   Yes.
25      Q   So the customers could see you when you --     03:31
```

Page 195

```
 1    BY MS. GRANT:

 2       Q    So did you ever use a chair to sit when you

 3    were in the tobacco cage?

 4       A    No, I did not.

 5       Q    In the entire time you worked at Sam's Club?   03:34

 6       A    No, I did not.

 7       Q    And did you ever tell any doctor that you

 8    thought it would be helpful to sit in a chair at

 9    work after you returned from your medical leave in

10    November 2012?                                          03:35

11       A    I don't think I did.

12       Q    And did any doctor recommend sitting in a

13    chair at work after you returned from medical leave

14    in 2012?

15       A    No.                                             03:35

16       Q    Did you bring up sitting in a chair again to

17    Marina Aguilar after that first time in

18    November 2012 when you returned from leave?

19       A    No.

20       Q    Did you have any discussions with anybody     03:35

21    else at Sam's Club regarding sitting in the chair

22    after you returned from medical leave in

23    November 2012?

24       A    No.

25       Q    And when you spoke to Marina regarding         03:36

                                               Page 199
```

```
 1    sitting in the chair, what did you say to her, as

 2    closely as you can remember, in terms of what words

 3    you said?

 4        A    Well, it involved a chair, and I could have

 5    said, "A chair would have help me while I'm by the       03:36

 6    register."  But I know that it involved a chair, so

 7    I -- I could have said something like that.

 8        Q    Do you have a specification recollection of

 9    what words you used related to the chair?

10        A    No.                                             03:36

11        Q    And other than saying, "Get out of here" in a

12    joking manner, what else did Marina Aguilar say in

13    that conversation relating to the chair?

14        A    Just walk away.

15        Q    You don't recall anything else she said?       03:37

16        A    No.  She was just laughing and walk away.

17        Q    Did you ask anyone else at Sam's Club for any

18    accommodations to perform your job duties after you

19    returned from medical leave in November 2012?

20            MR. LIBMAN:  Objection; calls for legal          03:37

21    opinions and conclusions, lacks foundation.

22            Go ahead.

23            THE WITNESS:  No.

24    BY MS. GRANT:

25        Q    And other than the comment about the chair,     03:38
```

Page 200

1  you didn't have any other conversations with Marina

2  Aguilar regarding any accommodations to perform your

3  job duties when you returned from medical leave in

4  November 2012, correct?

5      MR. LIBMAN:  Objection; calls for legal        03:38

6  conclusion and opinions, lacks foundation and

7  argumentative as phrased.

8      MS. GRANT:  Strike the question.  I actually

9  was going to strike it before Mr. Libman jumped in.

10     Q    Other than the conversation about the chair  03:38

11  that occurred in November 2012, you did not have any

12  other conversations with Marina Aguilar about any

13  accommodations to perform your job duties after you

14  returned from medical leave in November 2012,

15  correct?                                          03:38

16     MR. LIBMAN:  Objection; argumentative as

17  phrased, calls for legal opinions and conclusions,

18  lacks foundation.

19     THE WITNESS:  No.

20  BY MS. GRANT:                                     03:39

21     Q    No, you didn't have any or --

22     A    No.

23     Q    Pardon me?

24     A    No, I didn't have any.

25     Q    And you did not request any further leaves of  03:39

Page 201

```
 1    absence from anybody at Sam's Club after you
 2    returned from medical leave in November 2012,
 3    correct?
 4       A   No.
 5       Q   No, you did not?                              03:39
 6       A   I don't recall taking time off, no.  I don't
 7    remember.
 8           MS. GRANT:  Move to strike.
 9       Q   My question is whether you asked anyone at
10    Sam's Club for any additional medical leave after    03:40
11    you returned from medical leave in November 2012.
12       A   I don't think I did.
13           MS. GRANT:  Are you doing okay or --
14           THE REPORTER:  I'm okay.
15           MR. LIBMAN:  Counsel, you have 21 minutes      03:40
16    left on the seven-hour day.  Do you have an estimate
17    of how much longer you have if we should -- for us
18    to decide whether we want to accommodate you and
19    proceed beyond the seven hours allowed under the
20    code?                                                03:40
21           MS. GRANT:  I intend to use my seven hours of
22    on the record deposition testimony.  If you leave
23    before my seven hours on the record deposition
24    testimony, it will be over my objection and I will
25    seek relief from the court.                          03:41
```

                                                    Page 202

```
 1    that's still time that I'm entitled to question your

 2    witness.  That's what I'm saying.  It's not proper.

 3          You said -- you said that you were going to

 4    leave at 4:00, so could you at least let me question

 5    him until 4:00 before you start raising your              03:42

 6    objections?

 7          MR. LIBMAN:  I'm not raising any objections.

 8    I'm --

 9          MS. GRANT:  Okay.  Then I'll proceed then.

10          MR. LIBMAN:  Well, no, let me finish making        03:42

11    my record.

12          Subsection d(1) states:

13            "Duration:  Unless otherwise

14            stipulated or ordered by the court,

15            a deposition is limited to one day             03:42

16            of seven hours," period.

17          You can proceed.

18    BY MS. GRANT:

19       Q    While you were employed by Sam's Club, did

20    you have an understanding that cashiers were             03:43

21    expected to process cash transactions accurately?

22       A    Yes.

23       Q    And did you receive coachings related to your

24    improper or inaccurate processing of cash

25    transactions?                                            03:43
```

Page 205

```
 1      Q    Are you familiar with the disciplinary

 2   measures that the company may take relating to

 3   register operator accountability?

 4          MR. LIBMAN:  Objection; vague and ambiguous

 5   as to time, calls for a legal conclusion, lacks      03:48

 6   foundation.

 7          THE WITNESS:  Somewhat.

 8   BY MS. GRANT:

 9      Q    While you worked at Sam's Club, during the

10   time you were a tobacco cashier, were you -- were    03:48

11   you familiar with the disciplinary measures that the

12   company could take related to register operator

13   accountability?

14          MR. LIBMAN:  Objection; overbroad as to time,

15   lacks foundation, calls for legal conclusions and    03:48

16   opinions.

17          Go ahead.

18          THE WITNESS:  Yeah, yes.

19   BY MS. GRANT:

20      Q    And during the last five years of your       03:48

21   employment with Sam's Club, were you familiar with

22   the disciplinary measures that the company could

23   take relating to register operator accountability?

24      A    Yes.

25      Q    Are you aware of anybody who was on a third   03:49
```

Page 207

```
 1   written warning who had a cash shortage or overage

 2   above a hundred dollars whose employment was not

 3   terminated at your Sam's Club?

 4        MR. LIBMAN:  Objection; lacks foundation,

 5   calls for speculation, assumes facts not in          03:50

 6   evidence.

 7        Go ahead.

 8        THE WITNESS:  This is almost confidential.

 9   You don't want to share your personal situation with

10   anybody.  I don't -- we didn't got involved in.     03:50

11        MS. GRANT:  Move to strike.

12   Q    Could you please answer my question.

13        MR. LIBMAN:  Objection; argumentative, same

14   objections.

15        THE WITNESS:  I don't know anybody, no.         03:50

16        MS. GRANT:  I'd like to mark as Exhibit 11

17   the discrimination and harassment policy as of

18   September 19th, 2011.

19        (Exhibit 11 was marked for identification

20        by the court reporter and is attached hereto.)  03:51

21   BY MS. GRANT:

22   Q    Have you seen Exhibit 11 before?

23   A    It's possible that I have.

24   Q    Had you seen Exhibit 11 while you were

25   employed at Sam's Club?                              03:52
```

                                              Page 208

```
 1      A    Yes.

 2      Q    And were you aware that the company had a

 3  policy against discrimination and harassment?

 4      A    Yes.

 5      Q    While you worked at Sam's Club, did you        03:52

 6  report what you believed to be any unlawful conduct?

 7      A    I -- I didn't have anything to report.

 8      Q    So you were unaware of any unlawful conduct

 9  while you worked at Sam's Club, correct?

10          MR. LIBMAN:  Objection; calls for a legal       03:53

11  conclusion as to what is or is not unlawful conduct.

12          Go ahead.

13          THE WITNESS:  I didn't have anything to

14  report.

15  BY MS. GRANT:                                            03:53

16      Q    So you were unaware of any unlawful conduct

17  that occurred while you worked at Sam's Club,

18  correct?

19          MR. LIBMAN:  Objection; calls for legal

20  conclusions and opinions as to what is or was not      03:53

21  unlawful.

22          THE WITNESS:  No.

23  BY MS. GRANT:

24      Q    Did you make any complaints in the last three

25  years of your employment at Sam's Club to anybody at   03:53
```

Page 209

```
1    BY MS. GRANT:
2        Q    What I'm -- no, I'm asking you -- I'm asking
3    you a specific question related to your final
4    statement of pay.
5            Is there anything -- so I'll withdraw my          03:58
6    prior question, because I don't think you understood
7    me, and maybe that's my fault.  It was my
8    miscommunication.  It was a bad question.
9            Is there anything on your statement of final
10   pay that you believe to be inaccurate?                    03:58
11           MR. LIBMAN:  Objection; it calls for legal
12   conclusions and opinions, overbroad.
13           THE WITNESS:  Frankly, I haven't looked at
14   every single line on the -- on what they -- they
15   pay.  I didn't -- I don't know.                           03:59
16   BY MS. GRANT:
17       Q    As you sit here today, is there anything that
18   you believe on your final wage statement that was
19   inaccurate?
20           MR. LIBMAN:  Objection; calls for legal           03:59
21   conclusions and opinions, work product and possibly
22   attorney-client privilege.
23           Please respond only with information
24   excluding any work product or information that you
25   may have learned from me.                                 03:59
```

Page 212

```
 1    it?

 2            THE REPORTER:  I didn't get an answer.

 3            MS. GRANT:  Okay.

 4            THE WITNESS:  I can't tell.

 5    BY MS. GRANT:                                        04:00

 6       Q    So there's nothing that you can point to on

 7    Exhibit 12 right now that you think is inaccurate --

 8            MR. LIBMAN:  Objection --

 9    BY MS. GRANT:

10       Q    -- correct?                                 04:01

11            MR. LIBMAN:  Objection; calls for a legal

12    conclusion and opinion, lacks foundation, may call

13    for attorney-client privilege and work product

14    communication.  Also, an improper contention

15    interrogatory, as phrased, during a deposition.     04:01

16            Again, please respond without -- excluding

17    any information you may have learned from me.

18            THE WITNESS:  I cannot.

19            MS. GRANT:  I'd like to mark as Exhibit 13 --

20            MR. LIBMAN:  Counsel --                      04:01

21            MS. GRANT:  -- the state specific --

22            MR. LIBMAN:  Counsel, it's 4 o'clock.

23            MS. GRANT:  I'm actually in the middle of a

24    question.

25            I'd like to mark as Exhibit 13 --           04:01
```

Page 214

1       I, the undersigned, a Certified Shorthand

2   Reporter of the State of California, do hereby

3   certify:

4       That the foregoing proceedings were taken

5   before me at the time and place herein set forth;

6   that any witnesses in the foregoing proceedings,

7   prior to testifying, were placed under oath; that a

8   record of the proceedings was made by me using

9   machine shorthand which was thereafter transcribed

10   under my direction; further, that the foregoing is

11   an accurate transcription thereof.

12       I further certify that I am neither

13   financially interested in the action nor a relative

14   or employee of any attorney of any of the parties.

15       IN WITNESS WHEREOF, I have this date

16   subscribed my name.

17

18   Dated: 1/20/2017

19

20

21              *Nadia Newhart*

                 NADIA NEWHART

22                CSR NO. 8714

23

24

25

                               Page 230

# EXHIBIT B

*mics √-*

# Job Description
## Tobacco Cashier



| | |
|---|---|
| **Wal-Mart Culture** | The success of SAM'S CLUB is linked to each Associate's mastery and daily application of the Company's Three Basic Beliefs: |

**Respect for the Individual**
Contributes to a unique family and team environment by demonstrating respect for and sensitivity to all Individuals; supporting the SAM'S CLUB commitment to diversity; following through on commitments; and communicating clearly and courteously with fellow Associates, Members, and Suppliers;

**Service to our Members**
Makes shopping at SAM'S CLUB a uniquely positive experience by greeting Members with warmth, enthusiasm, energy, and courtesy; showing a personal interest in them; determining what help they need and promptly delivering it; and mastering SAM'S CLUB products and services; and

**Strive for Excellence**
Behaves in a lawful, honest, and ethical manner at all times; sets and achieves high standards of performance; takes personal responsibility for completing duties timely and efficiently; shows initiative; and suggests ways in which SAM'S CLUB can continuously improve.

**Job Responsibilities**
Primary job responsibilities and functions are listed below. An Associate in this position will be expected to perform additional job-related responsibilities and duties throughout the facility as assigned and/or as necessary.

**Operations**

- Processes Member purchases by scanning merchandise quickly and accurately, verifying proper Member identification, identifying all types of Membership cards and the transaction procedures for each type of card, and verifying proper age identification when selling age-restricted items. Processes all payment types, such as cash, checks, debit or credit; maintains proper cash levels and controls; maintains and organizes appropriate currency amounts in the register drawer; gives appropriate change; and greets and thanks the Member by name with every transaction.

- Completes all aspects of a sales transaction process, including picking up merchandise, scanning merchandise quickly and accurately according to the Company's items Per Hour (IPH) standard, looking at register display to verify scanned items, and transferring and boxing merchandise.

- Understands and operates all cash register functions and equipment, such as the register, scanner, scan gun, printer, handheld terminal, Tellermate, and signature capture device, to complete a sales transaction.

- Communicates effectively in verbal or written format to answer Member questions and location of merchandise, and provides guidance on Membership topics, including but not limited to: merchandise warranties, Membership renewal, credit, pass conversions, and Club hours for all Membership types.

- Ensures a safe and clean environment by maintaining safety standards, performing maintenance, and cleaning as required by the Tobacco area, including but not limited to: eliminating obstacles in the cash register lanes to prevent slip, trip, and fall hazards.

- Monitors area for signs of shrink and potential security risks, including but not limited to: inspecting boxes that appear to have been opened or tampered with, looking at the Bottom of Basket (BOB) for concealed merchandise; practicing Look Inside Always (LISA); practicing the Pick-Scan-Look-Box technique (Pick up the item, Scan it, Look at the register display, and Box up the items); and contacts management and/or In-Club Loss Prevention when potential problems are identified.

- Communicates and responds effectively to Members to answer questions regarding the tobacco return policy, different brands of cigarettes, prices and location of merchandise, and the use of tobacco paraphernalia, such as lighters and rolling paper.

- Completes and maintains the Cigarette Contraband Tax Act (CCTA) Log.

- Ensures Tobacco Area is secured in accordance with Company guidelines.

**Merchandising**

- Demonstrates and utilizes knowledge and performance of zoning, stocking, and handling register endcap merchandise, damaged goods, merchandise left behind, UPC code problems, and pricing integrity.

- Ensures proper inventory level of tobacco merchandise by monitoring, stocking, and notifying a member of management if merchandise is low or out of stock.

- Maintains the overall appearance of the tobacco register area by keeping the counter, floor, cigarette shelves, and backstock neat, clean, and clutter free at all times.

EXHIBIT
4
Vargas
PENGAD 800-631-6989

WM000102

# Job Description
## Tobacco Cashier



- Adheres to standards and policies for product rotation, sell-by dates, and expiration dates to ensure fresh, quality products.
- Conducts pre-sell of seasonal merchandise over the phone, including but not limited to: poinsettias, ham, turkeys, etc., to members for bulk purchases.

*People*

- Demonstrates dependability and reliability by being punctual, working assigned shifts, and completing responsibilities in a timely manner.
- Interacts politely and effectively with Members and Associates by representing Wal-Mart Culture, including the Ten Foot and Sundown Rules.
- Talks with, listens to, and signals others to effectively exchange information; receives or gives direction; and effectively works as part of a team by responding to assistance requests throughout the facility.

**Key Characteristics**

Key Characteristics of job functions are listed below:

- Ability to adapt to and work effectively in various parts of the facility.
- Ability to complete mathematical computations, including addition, subtraction, multiplication, and division.
- Ability to count back change.
- Ability to interact and communicate effectively with Members, Associates, and Suppliers.
- Ability to learn more about merchandise and utilize product information to meet Member needs.
- Ability to prioritize work tasks and complete duties within established work routines and procedures.
- Ability to read, write, and understand printed materials.
- Knowledge of and ability to apply Company and department policies and procedures.
- Knowledge of and proficiency with scanning equipment and cash register operation.

**Essential Functions**

The Essential Functions of the position are listed below.

- Provides quality Member service by answering questions, locating and retrieving merchandise, and completing sales transactions, which involve:
  - Maintaining appropriate cash levels and controls, giving appropriate change, and greeting and thanking Members by name;
  - Visually reading and verifying small print on Membership cards, Member identification, payment information, and register display screen;
  - Using verbal or written communication with Members and other Associates to resolve concerns effectively and process sales transactions accurately;
  - Using fine motor skills and coordination, including but not limited to: handling money and making change and grasping, turning, and manipulating small objects, such as receipts, writing utensils, bills, and coins;
  - Constantly moving, bending, kneeling, reaching, and twisting while handling items;
  - Constantly picking up and scanning merchandise, looking at boxes, and transferring merchandise of varying sizes and weights up to 30 pounds without assistance and over 30 pounds with team lifting; and
  - Verifying proper identification when selling age-restricted items and processing payments;
- Straightens, stocks, and cleans the Front-end areas, which involve:
  - Frequently pushing and pulling carts, flatbeds, and merchandise while processing an order or zoning merchandise;
  - Frequently lifting, sorting, and placing merchandise and supplies weighing up to 30 pounds without assistance and over 30 pounds with team lifting;
  - Frequently changing positions, which involves standing, bending, twisting, squatting, and walking within any area of the facility to assist Members or other Associates;
  - Occasionally sweeping the floor and emptying the trash in the tobacco and register areas; and
  - Occasionally using chemical cleaners, as necessary, to maintain the tobacco and Front-end areas.

WM000103

Exhibit B - Page 92

# Job Description
## Tobacco Cashier



| Signature | I have read and understand the essential functions for this position and certify that: |
|---|---|
| | I have the ability to perform the essential functions of this position either with or without a reasonable accommodation. |
| | I do not have the ability to perform the essential functions of this position either with or without a reasonable accommodation. |

| | | |
|---|---|---|
| Associate/Applicant Printed Name | Associate/Applicant Signature | 2-13-06 |
| | | Date |

---

WM000104

Exhibit B - Page 93

EXHIBIT C

## WALMART LEAVE OF ABSENCE PACKET – CALIFORNIA
## (FMLA)

The purpose of an FMLA leave of absence is to provide for needed time away from work while maintaining continuity of employment and eligibility for certain benefits.

This section is designed to let you know what is expected of you and what you can expect from us during a leave of absence, as well as to provide you with various forms you may need. If you have additional questions, please talk with your Human Resources representative and refer to the written policy. We look forward to your return to work at the end of your leave.

This packet includes:
- Requesting Leave of Absence/Associate's Checklist Information
- Manager's Checklist
- State and Federal Notices
- Leave of Absence Request Form
- Certification Forms

## REQUESTING FMLA LEAVE OF ABSENCE
## ASSOCIATE'S CHECKLIST

☐    Complete and submit a Request for Leave Form (supply documentation as required).

You should provide reasonable advance notice of your need for Leave by submitting a Request for Leave Form found in this packet. If your need for FMLA Leave is foreseeable, you must notify the company at least 30 days before you need to take leave. If your need for FMLA Leave is not foreseeable, you are required to give notice as soon as practicable, generally the same day or the following business day after learning that you need to take leave.

If you cannot give personal notice due to an emergency, your representative (e.g., a family member or other responsible party) may give notice. You must submit a Request for Leave Form to your Human Resources representative as soon as you are able to do so. In this situation, the date the leave begins is the first scheduled work day missed.

If you miss work for more than three days because a family member or you are ill or injured, you should immediately notify your supervisor or manager, so it can be determined whether a FMLA Leave of absence is available to you.

You should submit the Request for Leave Form for approval and processing to your Human Resources representative. If you do not provide accurate information on any leave of absence form, or you use a leave of absence for any reason other than that for which you requested and Walmart approved, you will be subject to discipline, up to and including termination.

☐    In addition to the Request for Leave Form, you must submit a completed copy of the appropriate Certification Form, as indicated below, within 15 days of receiving the Notice of Eligibility and Rights & Responsibilities. All Certification Forms can be found in this packet.

    ☐   Certification of Health Care Provider - California
    ☐   Certification of Military Family Care Leave
    ☐   Certification of Military Family Exigency Circumstances

WM000261


EXHIBIT
5
Vargas
PENGAD 800-631-6989

Exhibit C - Page 94

It is your responsibility to provide the Certification Form to the appropriate health care provider, for yours or your family member's serious health condition or your covered servicemember's serious injury or illness, and ensure that he or she completes the form and signs it. You are required to return the completed form to your Human Resources representative promptly, generally within 15 days of receiving the Notice of Eligibility and Rights & Responsibilities. If circumstances outside your control prevent you from doing so, you are required to submit the form as soon as possible thereafter. A final decision about whether you are entitled to an FMLA Leave cannot be made until you return the completed form. If you do not provide reasonable notice and/or a timely certification, as described above, you may have your leave or absence delayed and/or your absences may not be protected under FMLA.

Walmart may require a second and third medical opinion of the certification, at the company's expense, if the company determines that such verification is appropriate.

☐   If you have insurance coverage, determine whether you want to:

    ☐   Discontinue coverage while on leave of absence by calling the Benefits Customer Service at (800) 421-1362 to submit a Family Status Change within 60 days of the first day of an approved leave of absence.

    ☐   Reduce coverage while on leave of absence, determine amount of premium by calling the Benefits Service Team at the number listed above, and submit a Family Status Change within 60 days of the first day of an approved leave of absence.

    ☐   Continue same coverage you currently have. If you continue with the same coverage that you currently have you will need to make your premium payment each pay period if you are not receiving a payroll check.

Short- and Long-Term Disability premiums are based on amount of earnings each pay period. When there are no earnings, no disability insurance premiums are due.

Please pay premiums every two (2) weeks if you are not receiving a payroll check. Make your check or money order payable to: Associates' Health and Welfare Trust. Write your Social Security Number or Benefit Identification Number and your Facility Number on your check or money order and mail your payment to:
    **Walmart Benefits**
    **Dept. 3001**
    **P.O. Box 1039**
    **Lowell, AR 72745**

You may also pay by credit card by calling (800) 421-1362 and selecting the "credit card payment" option.

**Note: Failure to submit payments within 30 days of the due date may result in cancellation of coverage. If coverage is canceled for non-payment of premiums, any claims incurred after the date for which you have paid the required premiums will not be paid. Insurance premiums are NOT DEDUCTED from Workers' Compensation or disability checks. You must pay your insurance premiums.**

☐   If you have available Deferred Holiday Pay, Vacation Pay, or Personal Time Pay, or if you qualify to use available Illness Protection Time Pay, and want to use these benefits, tell your supervisor or Human Resources representative so it can be entered into the system. When using income replacement benefits, we will deduct premiums from your payroll check, provided enough hours are keyed to cover the full premium.

☐   You may be required to submit a new Certification Form to confirm your continuing need for a FMLA Leave under the following circumstances:
    o   Your leave expires and you request an extension;
    o   Circumstances described in your original request have changed significantly;
    o   Something happens to cast doubt on the reason for the absence or the continuing validity of the certification; or
    o   Every six months

2

WM000262

Exhibit C - Page 95

Upon the company's request, you are required to return the completed Certification Form within 15 calendar days. If circumstances outside your control prevent you from doing so, you are required to submit the form as soon as possible thereafter. Your continued ability to take FMLA Leave depends on your timely submission of the Certification Form, as well as your continuing eligibility for a FMLA Leave.

☐ If you need to extend your leave of absence beyond the time initially requested, you must request an extension as soon as possible by submitting another Request for Leave Form and a new Certification Form your Human Resources representative. Your continued ability to take a leave of absence depends on your timely submission of the new Certification Form, as well as your continuing eligibility for a leave of absence.

☐ If you do not return to work from a leave of absence, you may be eligible to continue coverage for an additional 18 months under COBRA by paying your portion and the company's portion of the premium and 2% for administrative handling. Contact your Human Resources representative for additional information.

☐ If you are on an approved leave of absence you may continue your Walmart Discount Card privileges. Once you reach one year on a leave of absence, your Discount Card will be deactivated. Your Human Resources representative will need to call Benefits Customer Service at 1-800-421-1362 to have your card reactivated when you return to work.

☐ Contact your supervisor at least three (3) weeks prior to the end of your leave to confirm the date of your return or, if needed, to request an extension. If requesting an extension of your leave of absence, complete and submit another Request for Leave Form.

☐ You must provide a release to return to work from your health care provider, if applicable, in order to resume working.

☐ Contact the Benefits Customer Service Team at 1-800-421-1362 to restore reduced or discontinued insurance within 60 days of return to work.

☐ If you have Short-Term, Short-Term Plus, or Long-Term Disability you must contact The Hartford at (800) 492-5678 immediately following your last day worked to file a disability claim.

☐ In the state of CA associates are covered under the State Disability Plan, and associates will need to call the State Specific number listed below for additional information.
CA:  (800) 480-3287

NOTE: If there is a disagreement between the contents of this packet and the legal documents, which define the benefits, the legal documents will always govern.

3

WM000263

Exhibit C - Page 96

## FMLA LEAVE OF ABSENCE
## MANAGER'S CHECKLIST

Discuss the following with any associate who indicates he/she needs an FMLA Leave. Check off each item as it is covered with the associate.

- [ ] Provide an <u>Eligibility Notice</u> within 5 days of the associate's initial request for leave.

- [ ] If the associate is eligible for FMLA leave, complete the Rights and Responsibilities section of the Eligibility Notice and provide to the associate within 5 days of his/her initial request for leave.

- [ ] Give the associate an FMLA Leave of Absence Packet.

- [ ] Confirm the associate's current home address and phone number.

- [ ] Explain the associate's notice requirements: Normally 30 days in advance; if an emergency, notice must be provided the day leave is requested or the next business day and explain the Request for Leave Form and applicable Certification Form must be completed and returned within 15 days of the associate receiving the Notice of Eligibility and Rights & Responsibilities.

- [ ] Explain certification requirements: The appropriate Certification Form must be completed by a health care provider, for medically related leaves. In addition, before returning to work, if the LOA is due to the associate's own medical condition, the associate must provide a statement from his/her health care provider certifying the associate has been released to return to work.

- [ ] Explain that the associate will need to call in every scheduled workday until the completed LOA paperwork has been returned and has been approved.

- [ ] Provide a <u>Designation Notice</u> within 5 days of receiving the sufficiently completed Request for Leave Form and Certification Form.

- [ ] Explain the rolling 12 weeks for job protected leave (if applicable). Explain the 26 weeks for job protected leave in a single 12-month period, if applicable.

- [ ] Explain that vacation, personal time, illness protection and salary continuance may be used by associates who are eligible for and have remaining time available.

- [ ] Provide an Hours Adjustment/Prize or Award Form for the associate to complete if he/she is requesting and is eligible to use vacation, personal or illness protection hours.

- [ ] Explain that any active Coaching on record will be suspended during the LOA. (Not applicable to Field Logistics)

- [ ] Distribute the California *State Disability Insurance Provisions* brochure to any associate taking a leave of absence due to pregnancy, sickness, or injury not related to the job.

  State Disability Insurance Provisions - English

  State Disability Insurance Provisions - Spanish

- [ ] Distribute the California *Paid Family Leave* brochure to any associate taking a leave of absence or who will be or has been absent from work to care for a seriously ill child, spouse, parent, or domestic partner, or to bond with a new child.

  Paid Family Leave - English

  Paid Family Leave - Spanish

- [ ] Explain insurance benefits: While on LOA, insurance coverage may be reduced or discontinued while on LOA by submitting a Family Status Change or current coverage may be continued for 12 months (including Worker's Comp).

4

WM000264

Exhibit C - Page 97

☐   Explain that insurance premiums must be paid every 2 weeks and that coverage may be cancelled if premiums are not paid within 30 days of the due date (Rhode Island associates need to pay premiums every week). Give the associate a premium payment schedule from the WIRE>Life>My Health>Benefits Leave of Absence Resources. Help the associate determine the amount of premium; call Benefits Customer Service at 1-800-421-1362 if assistance is needed.

☐   Explain Short-Term and Long-Term Disability: If the illness or injury is expected to exceed 14 days, is not work related, and the associate is enrolled in Short-Term or Long-Term Disability, the associate must contact The Hartford at 1-800-492-5678 immediately following their last day worked in order to file a disability claim.

☐   Explain Long-Term Disability (hourly associates): If the illness or injury is expected to exceed 195 calendar days The Hartford will transfer the claim from Short-Term Disability to Long-Term Disability on the 17th week of disability.

☐   Explain Long-Term Disability (management associates and Truck Drivers): If the illness or injury is expected to exceed 90 days, you will need to call The Hartford at 1-800-492-5678 by the 45th day of your salary continuance in order to file a claim.

☐   Explain the Return to Work procedure.

☐   Answer questions the associate has about LOA. Call your HR representative if needed.

Associate Signature: _____  Date: 10-01-12

Facility Manager/: _____  Date: _____
HR Representative Signature

5

WM000265

Exhibit C - Page 98

# GENERAL NOTICE (Family and Medical Leave Act)

**Basic Leave Entitlement**
FMLA provides up to 12 weeks of unpaid, job-protected leave to eligible associates for the following reasons:

- For incapacity due to pregnancy, prenatal medical care or child birth;
- To care for the associate's child after birth, or placement for adoption or foster care;
- To care for the associate's spouse, son or daughter, or parent, who has a serious health condition; or
- For a serious health condition that makes the associate unable to perform the associate's job.

**Military Family Leave Entitlements**
Eligible associates with a spouse, son, daughter, or parent on active duty or call to active-duty status in the Armed Forces, including the National Guard or Reserves in a foreign country may use FMLA leave to address certain qualifying exigencies. Qualifying exigencies may include attending certain military events, arranging for alternative childcare, addressing certain financial and legal arrangements, attending certain counseling sessions, and attending post-deployment reintegration briefings. Eligible associates may also use FMLA Leave to care for certain family members who are currently in the Armed Forces or veterans and have incurred an injury or illness in the line of duty. Refer to the FMLA Leave of Absence Policy for complete information. Some states provide additional leave entitlements.

FMLA also includes a special leave entitlement that permits eligible associates to take up to 26 weeks of leave to care for a covered servicemember during a single 12-month period. A covered servicemember is (1) a *current* member of the Armed Forces, including a member of the National Guard or Reserves, who has a serious injury or illness incurred in the line of duty on active duty (or existed before the beginning of his/her active duty and was aggravated by service in line of duty) that may render the service member medically unfit to perform his or her duties for which the service member is undergoing medical treatment, recuperation, or therapy; or is in outpatient status; or is on the temporary disability retired list; or (2) a *veteran* of the Armed Forces, including the National Guard or Reserves, who has a serious injury or illness that was incurred in line of duty on active duty (or existed before the beginning of his/her active duty and was aggravated by service in line of duty on active duty) and that manifested itself before or after the servicemember became a veteran for which s/he is undergoing medical treatment, recuperation, or therapy within five years of his/her discharge/release from military service (under conditions other than dishonorable).

**Benefits and Protections**
During FMLA leave, the employer must maintain the associate's health coverage under any "group health plan" on the same terms as if the associate had continued to work. Upon return from FMLA leave, most associates must be restored to their original or equivalent positions with equivalent pay, benefits, and other employment terms. Use of FMLA leave cannot result in the loss of any employment benefit that accrued prior to the start of an associate's leave.

**Eligibility Requirements**
Associates are eligible if they have worked for a covered employer for at least one year, for 1,250 hours over the previous 12 months, and if at least 50 associates are employed by the employer within 75 miles.

**Definition of Serious Health Condition**
A serious health condition is an illness, injury, impairment, or physical or mental condition that involves either an overnight stay in a medical care facility, or continuing treatment by a health care provider for a condition that either prevents the associate from performing the functions of the associate's job, or prevents the qualified family member from participating in school or other daily activities.

Subject to certain conditions, the continuing treatment requirement may be met by a period of incapacity of more than 3 consecutive calendar days combined with at least two visits to a health care provider or one visit and a regimen of continuing treatment, or incapacity due to pregnancy, or incapacity due to a chronic condition. Other conditions may meet the definition of continuing treatment.

**Use of Leave**
An associate does not need to use this leave entitlement in one block. Leave can be taken intermittently or on a reduced leave schedule when medically necessary. Associates must make reasonable efforts to schedule leave for planned medical treatment so as not to unduly disrupt the employer's operations. Leave due to qualifying exigencies may also be taken on an intermittent basis.

**Substitution of Paid Leave for Unpaid Leave**
Associates may choose or employers may require use of available income replacement benefits while taking FMLA leave. In order to use available income replacement benefits for FMLA leave, associates must comply with the employer's normal income replacement benefits policies.

**Associate Responsibilities**
Associates must provide 30 days advance notice of the need to take FMLA leave when the need is foreseeable. When 30 days notice is not possible, the associate must provide notice as soon as practicable and generally must comply with an employer's normal call-in procedures. Associates must provide sufficient information for the employer to determine if the leave may qualify for FMLA protection and the anticipated timing and duration of the leave. Sufficient information may include that the associate is unable to perform job functions, the family member is unable to perform daily activities, the need for hospitalization or continuing treatment by a health care provider, or circumstances supporting the need for military family leave. Associates also must inform the employer if the requested leave is for a reason for which FMLA leave was previously taken or certified. Associates also may be required to provide a certification and periodic recertification supporting the need for leave.

**Employer Responsibilities**
Covered employers must inform associates requesting leave whether they are eligible under FMLA. If they are, the notice must specify any additional information required as well as the associates' rights and responsibilities. If they are not eligible, the employer must provide a reason for the ineligibility.

**Unlawful Acts by Employers**
FMLA makes it unlawful for any employer to:

- Interfere with, restrain, or deny the exercise of any right provided under FMLA;
- Discharge or discriminate against any person for opposing any practice made unlawful by FMLA or for involvement in any proceeding under or relating to FMLA.

**Enforcement**
An employee may file a complaint with the U.S. Department of Labor or may bring a private lawsuit against an employer.

FMLA does not affect any Federal or State law prohibiting discrimination, or supersede any State or local law or collective bargaining agreement which provides greater family or medical leave rights.

October 28, 2009

6

WM000266

Exhibit C - Page 99

## NOTICE OF CALIFORNIA CARE AND MEDICAL LEAVE
## (CFRA LEAVE) AND PREGNANCY DISABILITY LEAVE

Under the California Family Rights Act of 1993 (CFRA), if you have more than 12 months of service with us and have worked at least 1,250 hours in the 12-month period before the date you want to begin your leave, you may have a right to an unpaid family care or medical leave (CFRA leave). This leave may be up to 12 workweeks in a 12-month period, which begins on the first day of the leave, for the birth, adoption, or foster care placement of your child or for your own serious health condition or that of your child, parent, spouse, Registered Domestic Partner, or child of a Registered Domestic Partner.

NOTE:   CFRA leave runs concurrently with FMLA leave.

Even if you are not eligible for CFRA leave, if you are disabled by pregnancy, childbirth or related medical conditions, you are entitled to take a pregnancy disability leave of up to four months, depending on your period(s) of actual disability. If you are CFRA-eligible, you have certain rights to take BOTH a pregnancy disability leave and a CFRA leave for reason of the birth of your child. Both leaves contain a guarantee of reinstatement to the same or to a comparable position at the end of the leave, subject to any defense allowed under the law.

If possible, you must provide at least 30 days advance notice for foreseeable events (such as the expected birth of a child or a planned medical treatment for yourself or of a family member). For events which are unforeseeable, we need you to notify us, at least verbally, as soon as you learn of the need for the leave, but not later than 3 days after the commencement of the leave. The written request for leave must be completed and submitted for approval as soon as practical, but not later than 15 days after the commencement of the leave. Failure to comply with these notice rules is grounds for, and may result in, deferral of the requested leave until you comply with this notice policy.

We may require certification from your health care provider before allowing you a leave for pregnancy or your own serious health condition or certification from the health care provider of your child, parent, spouse, Registered Domestic Partner, or child of a Registered Domestic Partner who has a serious health condition before allowing you a leave to take care of that family member. When medically necessary, leave may be taken on an intermittent or reduced work schedule.

If you are taking a leave for the birth, adoption or foster care placement of a child, the basic minimum duration of the leave is two weeks and you must conclude the leave within one year of the birth or placement for adoption or foster care. You are allowed a maximum of 12 weeks for this parental leave under CFRA.

Taking a family care or pregnancy disability leave may impact certain benefits. If you want more information regarding your eligibility for a leave and/or the impact of the leave on your benefits, please contact Facility Manager, People Manager, MHRM, or RHRM.

7

WM000267

Exhibit C - Page 100

## NOTIFICACIÓN DE PERMISO DE AUSENCIA MÉDICA Y CUIDADO MÉDICO FAMILIAR DE CALIFORNIA (CFRA LEAVE) Y PERMISO MÉDICO POR EMBARAZO

Bajo el Acta sobre los Derechos de la Familia Californiana de 1993 (*CFRA leave*), si usted tiene más de 12 meses de servicio con nuestra empresa y ha trabajado más de 1,250 horas dentro del período de 12 meses antes de la fecha que usted quiere comenzar su salida, usted puede tener el derecho a un permiso de ausencia no remunerado para el cuidado familiar o médico (*CFRA leave*). Este permiso de ausencia no remunerado puede ser de hasta 12 semanas dentro de un período de 12 meses, el cual comienza el primer día del permiso de ausencia no remunerado por el nacimiento, la adopción, o la colocación de su hijo en un hogar adoptivo, o por una condición médica grave, suya, de su hijo(a), de uno (o ambos) de sus padres, su esposo(o), su concubina(a), o el hijo(a) de su concubino(a).

NOTA: *CFRA leave* funciona concurrentemente con el *"FMLA leave."*

Aunque usted no califique para un *CFRA leave*, si está suspendida por embarazo, alumbramiento o cualquier condición médica relacionada, usted tiene derecho a obtener un permiso de ausencia de hasta cuatro meses, dependiendo del período de su suspensión por embarazo actual. Si usted es elegible para *CFRA leave*, usted goza de ciertos derechos para tomar ambos; un permiso de ausencia por embarazo y un permiso de ausencia por el nacimiento de su hijo(a). Ambos permisos de ausencia mantienen la garantía de reincorporación a la misma posición, o a una posición comparable, al final del permiso, sujeto a cualquier defensa legal permitida bajo la ley.

Si es posible, usted puede suministrar un preaviso de por lo menos 30 días de anticipación para eventos previsibles (tales como el alumbramiento de un bebé o un tratamiento médico para usted o algún miembro de su familia). Para eventos impredecibles, necesitamos que nos informe, aunque sea verbalmente, tan pronto sepa de la necesidad del permiso de ausencia, pero no más de tres días después del comienzo de la ausencia. La petición por escrito del permiso de ausencia debe ser finiquitado y sometido para su aprobación tan pronto como sea posible, pero no más de 15 días después del comienzo del permiso de ausencia. El incumplimiento de estas reglas con bases de, y pueden resultar en, retraso en la aprobación del permiso hasta que usted cumpla con los requisitos de esta notificación de póliza.

Nosotros podemos requerir la certificación de su médico antes de otorgarle el permiso de ausencia por motivo de embarazo o una condición médica grave o la certificación del médico de su hijo(a), padre/madre, esposo(o), concubino(a), o el hijo(a) de su concubino(a) que presentan una condición grave de salud, antes de aprobar el permiso de ausencia para el cuidado de ese miembro de la familia. Cuando sea médicamente necesario, los permisos de ausencia se pueden tomar de manera intermitente o a través de un horario de trabajo reducido.

Si usted está solicitando permiso de ausencia debido al nacimiento, adopción o la colocación de su hijo en un hogar adoptivo, la duración básica mínima de permiso de ausencia, es de dos semanas y usted debe concluir su permiso de ausencia al año del nacimiento de su hijo(a), o la colocación de su hijo(a) en adopción o en un hogar adoptivo. Bajo las normas de *CFRA leave*, el tiempo máximo permitido para un permiso de ausencia por maternidad es de 12 semanas.

Tomar permisos de ausencia por maternidad o cuidado familiar, puede impactar sus beneficios de alguna manera. Si usted desea más información en relación a su elegibilidad de permiso de ausencia y/o el impacto del permiso sobre sus beneficios, por favor contacte al gerente de la tienda, el gerente de personal, o al gerente regional de personal.

8

WM000268

Exhibit C - Page 101

**Walmart Leave of Absence Policy**
**REQUEST FOR LEAVE OF ABSENCE – FMLA**

| Associate Name: | Oniel L. Vargas | ID#: | 29 | Facility #: | 1625 |

| Complete Address: | 7353 Rubio Ave Van Nuys Ca. 91406 | Phone: | (818) 781-1873 |

You should give reasonable advance notice of your need for Leave by submitting this Request for Leave Form. Generally, if the need for leave is foreseeable, you should notify us at least 30 days before you need to take leave. If this is not foreseeable, you must notify us as soon as practicable, generally the day of or the next business day after learning that you need to take leave. You should submit the Request for Leave Form for approval and processing to your HR representative.

## Dates of Leave Requested

1.  Anticipated start and end dates of requested leave:   Start Date: **10-05-12**   End Date: **11-17-12**

2.  If you are requesting intermittent leave or reduced-schedule leave, please provide details regarding the anticipated schedule *(available only for FMLA Leave if your health care provider determines such leave is medically necessary due to a serious health condition or for military family leave)*:

## Reason for Leave Request

3.  Indicate the reason for which you are requesting leave (check all that apply):

| ☒ **Medical Leave** * | ☐ *Pregnancy* | ☐ *Workers' Compensation* | ☐ *Disability* | ☒ *Own Serious Health Condition* |
| ☐ **Parental Leave** | ☐ *Birth of Child* | ☐ *Adoption of Child* | ☐ *Foster Care Placement of Child* | |

| ☐ **Family Care Leave** * | ☐ *Child (name)* | |
| | ☐ *Parent (name)* | |
| | ☐ *Spouse (name)* | |
| | ☐ *Other (name)/ Relationship* | |

| ☐ **Military Family** * (Exigent Circumstances) | ☐ *Child (name)* | |
| | ☐ *Parent (name)* | |
| | ☐ *Spouse (name)* | |

| ☐ **Military Family Care** * (Serious Illness/Injury) | ☐ *Child (name)* | |
| | ☐ *Parent (name)* | |
| | ☐ *Spouse (name)* | |
| | ☐ *Next of Kin (name)* | |

*You must submit the applicable Certification Form in order to qualify for FMLA Leave. You must submit the Certification Form within 15 days of receipt of the form and/or within 15 days of your request for leave.

9

WM000269

Exhibit C - Page 102

## Walmart Leave of Absence Policy
### REQUEST FOR LEAVE OF ABSENCE – FMLA

| Associate Name: | Onier Vargas | ID#: | 29 | Facility #: | 6625 |

| Complete Address: | 7353 Phuto ave VanNuys, CA 91406 | Phone: | (818)781-1873 |

### Insurance Information

Unless you submit a STATUS CHANGE to reduce or discontinue coverage, your present insurance coverage may continue for up to one year while on a leave. If you choose to keep any medical, dental, life insurance, accidental death and dismemberment, short-term disability plus, critical illness or accident insurance, you must send the premium amount normally deducted from your paycheck to: Walmart Benefits, Department 3001, P.O. Box 1039, Lowell, AR 72745. Write your name, social security number or benefit identification number and facility number on your check or money order. (Payments for short- and long-term disability are not required while on Leave). The premium is due each pay period (every two weeks, except in Rhode Island where premiums are due weekly) in which you do not receive a Walmart payroll check. Failure to pay premiums within 30 days of the due date will result in cancellation of your coverage. If coverage is cancelled for non-payment of premium and you return to actively-at-work status within one year from cancellation, you will be automatically re-enrolled for the same coverage options (or, if this coverage is not available, the coverage that is most similar to your prior coverage). Your coverage will be effective the first day of the pay period you meet the actively-at-work requirement (see "Eligibility" section of the Benefit Book). If Leave extends beyond one year, you may be able to elect continued coverage under COBRA.

### Associate Certification

I agree to return to work on (return date): 11-17-12. If circumstances change such that I will not be able to return to work on that date, I will promptly inform my manager. I understand that I will be responsible for payment of applicable insurance premiums. I understand that if I fail to return to work or request an extension of leave by the return date stated above, my associate benefits shall be subject to forfeiture, and Walmart will have no further obligation to continue my employment. I also understand there will be no accumulation of benefits while I am on leave. I fully understand Walmart's Leave of Absence Policy. I have read and understand the "Insurance Information" section above.

The information I provided is true and accurate. If I misrepresent facts or falsify documents associated with my leave request, or if I use a Walmart Leave for any reason other than that for which I requested and obtained approval, I understand that I may be subject to discipline, up to and including termination, and/or a loss of any leave, to the extent permitted by law.

| Associate Signature: | | Date: | 10-01-12 |
| Name *(Print)*: | Onier Ja Vargas | | |

### HR Approval

| Dates Requested: | Start Date | 10-5-12 | End Date | 11-17-12 |
| Dates Approved: | Start Date | 10-5-12 | End Date | 11-17-12 |

Type of Leave Approved: FMLA

| Facility Manager/ Human Resources Signature | | Date: | 10/3/12 |
| Name *(Print)*: | ANGELA O. DEO | | ☒ Approved ☐ Denied |

10

WM000270

Exhibit C - Page 103

## CERTIFICATION OF HEALTH CARE PROVIDER - CALIFORNIA

1. Employee's Name: _ONIER VARGAS_

2. Patient's Name (if other than employee): _____

3. Date medical condition or need for treatment commenced: _10-5-12_

   [NOTE: THE HEALTH CARE PROVIDER IS NOT TO DISCLOSE THE UNDERLYING DIAGNOSIS WITHOUT THE CONSENT OF THE PATIENT]

   The Genetic Information Nondiscrimination Act of 2008 (GINA) prohibits employers and other entities covered by GINA Title II from requesting or requiring genetic information of an individual or family member of the individual, except as specifically allowed by this law. To comply with this law, we are asking that you not provide any genetic information when responding to this request for medical information. "Genetic Information" as defined by GINA includes an individual's family medical history, the results of an individual's or family member's genetic tests, the fact that an individual or an individual's family member sought or received genetic services, and genetic information of a fetus carried by an individual or an individual's family member or an embryo lawfully held by an individual or family member receiving assistive reproductive services.

4. Probable duration of medical condition or need for treatment: _4-6 WEEKS_

5. The attached sheet describes what is meant by a "serious health condition" under both the Federal Family and Medical Leave Act (FMLA) and the California Family Rights Act (CFRA). Does the patient's condition qualify under any of the categories described? If so, please check the appropriate category.

   (1) (2) (3) (4) (5) (6)

6. If the certification is for the serious health condition of the employee, please answer the following:

   Yes   No
   [ ]   [ ]   Is the employee able to perform work of any kind? (If "No," skip next question.)

   [x]   [ ]   Is employee unable to perform any one or more of the essential functions of employee's position?

   (Answer after reviewing statement from employer of essential functions of employee's position, or, if none provided, after discussing with employee.)

7. If the certification is for the care of the employee's family member, please answer the following:

   Yes   No
   [ ]   [ ]   Does (or will) the patient require assistance for basic medical, hygiene, nutritional need, safety, or transportation?

   [ ]   [ ]   After review of the employee's signed statement (See item 1 below), does the condition warrant the participation of the employee? (This participation may include psychological comfort and/or arranging for third-party care for the family member.)

8. Estimate the period of time care is needed or during which the employee's presence would be beneficial.

9. Please answer the following question only if the employee is asking for intermittent leave or a reduced work schedule.

   Yes   No
   [ ]   [ ]   Is it medically necessary for the employee to be off work on an intermittent basis or to work less than the or to work less than the employee's normal work schedule in order to deal with the serious health condition of the employee or family member?

   If the answer to 9 is yes, please indicate the estimated number of doctor's visits, and/or estimated duration of medical treatment, either by the health care practitioner or another provider of health services, upon referral from the health care provider. _____

II

WM000271

Exhibit C - Page 104

**ITEM 10 IS TO BE COMPLETED BY THE EMPLOYEE NEEDING FAMILY LEAVE**
**\*\*\*TO BE PROVIDED TO THE HEALTH CARE PROVIDER UNDER SEPARATE COVER**

10.  When family care leave is needed to care for a seriously-ill family member, the employee shall state the care he or she will provide and an estimate of the time period during which this care will be provided, including a schedule if leave is to be taken intermittently or on a reduced work schedule:

_____

11.  Printed Name of health care provider:

Signature of health care provider:

Date:

**Martin Smietanka, MD**
HealthCare Partners Medical Group
2211 W. Magnolia Blvd., #110
Burbank, CA 91506
T: (818) 955-5773  F: (818) 955-5181

12.  Signature of Employee:

Date:   10-02-12

*A "Serious Health Condition" means an illness, injury, impairment, or physical or mental condition that involves one of the following:*

*1.  Hospital Care Inpatient care (i.e. an overnight stay) in a hospital, hospice, or residential medical care facility, including any period of incapacity or subsequent treatment in connection with or consequent to such inpatient care.*

*2.  Absence Plus Treatment - A period of incapacity of more than three consecutive calendar days (including any subsequent treatment or period of incapacity relating to the same condition), that also involves:*

  *•  Treatment two or more times by a health care provider, by a nurse or physician's assistant under direct supervision of a health care provider, or by a provider of health care services (i.e. physical therapist) under orders of, or on referral by, a health care provider; or*

  *•  Treatment by a health care provider on at least one occasion which results in a regimen of continuing treatment under the supervision of the health care provider.*

*3.  Pregnancy [NOTE: An employee's own incapacity due to pregnancy is covered as a serious health condition under FMLA but not under CFRA] Any period of incapacity due to pregnancy, or for prenatal care.*

*4.  Chronic Conditions Requiring Treatment - Any condition which:*

  *•  Requires periodic visits for treatment by a health care provider, or by a nurse or physician's assistant under direct supervision of a health care provider*

  *•  Continues over an extended period of time (including recurring episodes of a single underlying condition): and*

  *•  May cause episodic rather than a continuing period of incapacity (i.e. asthma, diabetes, epilepsy, etc)*

*5.  Permanent/Long-Term Conditions Requiring Supervision - A period of incapacity which is permanent or long-term due to a condition for which treatment may not be effective. The employee or family member must be under the continuing supervision of, but need not be receiving active treatment by, a health care provider. (i.e. Alzheimer's, a severe stroke, or the terminal stages of a disease.)*

*6.  Multiple Treatments (Non-Chronic Conditions – Any period of absence to receive multiple treatments (including any period of recovery there from) by a health care provider or by a provider of health care services under orders of, or on referral by, a health care provider, either for restorative surgery after an accident or other injury, or for a condition that would likely result in a period of incapacity of more than three consecutive calendar days in the absence of medical intervention or treatment, such as cancer (chemotherapy, radiation, etc.) severe arthritis (physical therapy) kidney disease (dialysis).*

Revised January 10, 2011

12

WM000272

Exhibit C - Page 105

## NOTICE OF ELIGIBILITY AND RIGHTS & RESPONSIBILITIES (FMLA)

Associate's Name:  Onler Vargas

Work Location # 6625                                    Date 10/02/2012

### Eligibility

In general, to be eligible for FMLA Leave, you must have worked for an employer for at least 12 months and have worked at least 1, 250 hours in the 12 months preceding the leave.

On 10/02/2012     , you informed us that you needed leave beginning on 10/05/2012       for:

- [ ] The birth of a child, or placement of a child with you for adoption or foster care.

- [x] Your own serious health condition;

- [ ] Because you are needed to care for your☐ spouse;☐ child;☐ parent due to his/her serious health condition.

- [ ] Because of qualifying exigency arising out of the fact that your☐ spouse;☐ son or daughter;☐ parent is on active duty or call to active duty status in a foreign country as a member of the Armed forces, including the National Guard or Reserves.

- [ ] Because you are the ☐ spouse;☐ son or daughter;☐ parent;☐ next of kin of a covered servicemember with a serious injury or illness.

This Notice is to inform you that you:

- [x] Are eligible for FMLA leave (See below for your Rights and Responsibilities)

- [ ] Are eligible for FMLA leave; however, you do not have any FMLA leave available at this time.  Please refer to the Designation Notice.

- [ ] Are not eligible for FMLA leave, because (only one reason need be checked, although you may not be eligible for other reasons):
  - [ ] You have not met the FMLA's 12 month length of service requirement. As of the first date of requested leave, you will have worked approximately     months towards this requirement.
  - [ ] You have not met the FMLA's 1,250 hours-worked requirement.

You may be eligible for Personal or other leave under the Leave of Absence Policy (PD-24). If you have any questions, contact your HR representative or view the FMLA poster located in your facility or the Leave of Absence Policy (PD-24) located on the WIRE.

### Rights & Responsibilities (FMLA)

To be completed only if associate is eligible for FMLA.

You meet the eligibility requirements for taking FMLA leave and still have FMLA leave available in the applicable 12-month period. However, in order for us to determine whether your absence qualifies as FMLA leave, you must return the following information to us by  10/17/2012     .  If a certification is requested, employers must allow at least 15 calendar days from receipt of this notice; additional time may be required in some circumstances. If sufficient information is not provided in a timely manner, your leave may be denied.

WM000273

Exhibit C - Page 106

☐ Sufficient certification to support your request for FMLA leave. A certification form that sets forth the information necessary to support your request is enclosed.

☐ Sufficient documentation to establish the required relationship between you and your family member.

☐ Other information needed:

☑ No additional information requested.

If your leave does qualify as FMLA leave you will have the following responsibilities while on FMLA leave (only checked blanks apply):

☑ If you have insurance coverage, please pay premiums every two (2) weeks if you are not receiving a payroll check. (Rhode Island associates need to pay premiums every week). Make your check or money order payable to: Associates' Health and Welfare Trust.  Write your Social Security Number or Benefit Identification Number and your Facility Number on your check or money order and mail your payment to: Wal-Mart Benefits, Dept. 3001, P.O. Box 1039, Lowell, AR 72745.  You may also pay by credit card by calling (800) 421-1362 and selecting the "credit card payment" option.

Failure to submit payments within 30 days of the due date may result in cancellation of coverage.  If coverage is canceled for non-payment, any claims incurred after the date for which you have paid the required premiums will not be paid.  Insurance premiums are not deducted from Workers' Compensation or disability checks.

☑ While on leave you may be required to furnish us with periodic reports of your status and intent to return to work every 30 days.

If the circumstances of your leave change and you are able to return to work earlier than the date indicated on this form, you will be required to notify us at least two workdays prior to the date you intend to report for work.

If your leave does qualify as FMLA leave you will have the following rights while on FMLA leave:

- You have a right under FMLA for up to 12 weeks unpaid leave in a rolling 12-month period measured backward from the date of any FMLA leave usage.

- You have a right under the FMLA for up to 26 weeks of unpaid leave in a single 12-month period to care for a covered service member with a serious injury or illness. This single 12-month period commenced on

- Your health benefits must be maintained during any period of unpaid leave under the same conditions as if you continued to work.

- You must be reinstated to the same or an equivalent job with the same pay, benefits, and terms and conditions of employment on your return from FMLA-protected leave. (If your leave extends beyond the end of your FMLA entitlement, you do not have return rights under FMLA.)

- If you do not return to work following FMLA leave for a reason other than: 1) the continuation, recurrence, or onset of a serious health condition which would entitle you to FMLA leave; 2) the continuation, recurrence, or onset of a covered service member's serious injury or illness which would entitle you to FMLA leave; or 3) other circumstance beyond your control, you may be required to reimburse us for our share of health insurance premiums paid on your behalf during your FMLA leave.

WM000274

Exhibit C - Page 107

- You have the right to use available income replacement benefit, such as vacation, personal time or illness protection time in accordance with the applicable policy. Whether or not you receive income replacement benefits during you FMLA leave, the time taken for leave will counts towards your entitlement.

For a copy of conditions applicable to income replacement benefits please refer to the policies on the WIRE or ask your HR representative.

Once we obtain the information from you as specified above, we will inform you within 5 business days, whether your leave will be designated as a FMLA leave and count towards your FMLA leave entitlement. If you have any questions, please contact:

Mina Garcia                    at 818-365-7710

Revised October 28, 2009

WM000275

Exhibit C - Page 108

## NOTICE OF DESIGNATION (FMLA)

To: Onier Vargas          Date: 10/02/2012          Facility # 6625

We have reviewed your request for leave under the FMLA and any supporting documentation that you have provided. You requested leave for the following reason:

☐ Parental   ☑ Medical   ☐ Family Care   ☐ Military Family Exigency   ☐ Military Family Care

We received your most recent information on   10/02/2012   and decided:

☑ Your FMLA leave request is approved. All leave taken for this reason will be designated as FMLA leave up to the maximum of your available FMLA leave time.

The FMLA requires that you notify us as soon as practicable if dates of scheduled leave change or are extended, or were initially unknown. Based on the information you have provided to date, we are providing the following information about the amount of time that will be counted against your leave entitlement:

   ☑ Provided there is no deviation from your anticipated leave schedule, the following number of hours, days, or weeks will be counted against your leave entitlement: 12 weeks

   ☐ Because the leave you will need will be unscheduled, it is not possible to provide the hours, days, or weeks that will be counted against your FMLA entitlement at this time. You have the right to request this information once in a 30-day period (if leave was taken in the 30-day period).

   Please be advised (check if applicable):
   ☐ You have requested to use an available income replacement benefit during your FMLA leave. Any income replacement benefit utilized for this reason will be counted against your FMLA leave entitlement.

   ☑ You will be required to present a written release from your health care provider prior to returning to work, describing any restrictions you may have. If such release is not timely received, your return to work may be delayed until a release is provided. A list of the essential functions of your position   is  x   is not attached. If attached, the written release to return to work must address your ability to perform these functions.

☐ Additional information is needed to determine if your FMLA leave request can be approved:
   ☐ The certification you have provided is not complete and sufficient to determine whether the FMLA applies to your leave request. You must provide the following information no later than _____ (enter date of 7 days from date of this notice) unless it is not practicable under the particular circumstances despite your diligent good faith efforts, or your leave may be denied.

   ☐ We are exercising our right to have you obtain a second or third opinion medical certification at our expense, and we will provide further details at a later time.

☐ Your FMLA Leave request is not approved, due to the following:
   ☐ The FMLA does not apply to your leave request.
   ☐ You have exhausted your FMLA leave entitlement in the applicable 12-month period.

If you have any questions, please contact:   Mina Garcia   at   818-365-7710

You may submit a written appeal of the decision within 15 days to the next higher level HR representative not involved in the initial decision. You should utilize the Associate Appeal Letter to submit your appeal. Alternatively, your appeal may be submitted in writing in a form of your choosing. Advise your Manager or HR representative of your decision to appeal, and s/he will provide the appropriate contact information. The HR representative will review your appeal and provide to you a written response of their decision.

Revised March 13, 2009

WM000276

Exhibit C - Page 109

EXHIBIT D

## RETURN TO WORK / SCHOOL

**HealthCare Partners.**
Medical Group and Affiliated Physicians

DATE: 11/15/2012

PATIENT NAME: *Onier Vargas*                    HCP Site: *GF Glendale*

TO WHOM IT MAY CONCERN:

THE ABOVE PATIENT IS UNDER MY CARE AND:

☑   PLEASE EXCUSE FROM WORK/SCHOOL FROM *present*  TO 11/16/2012 , MAY RETURN TO
     WORK/SCHOOL ON: 11/19/2012 .

☐   HAS RECOVERED AND MAY RETURN TO LIGHT WORK ON: _____

☐   HAS RECOVERED AND MAY RETURN TO WORK/SCHOOL ON: _____

☐   REQUIRES A MEDICAL LEAVE OF ABSENCE FROM: _____ TO _____

☐   IS RESTRICTED FROM: _____ UNTIL _____
                                                                                    DATE

☐   RECEIVED TREATMENT AT MY OFFICES ON: _____

☐   IS SCHEDULED TO RETURN ON: _____ AT _____

REMARKS:

_____
PROVIDER SIGNATURE

MGO-CLIN-004 (4/02)              CHART COPY (WHITE)        PATIENT'S COPY (CANARY)

WM000260



Exhibit D - Page 110

EXHIBIT E

HealthCare Partners Medical Group

October 18, 2012

| | |
|---|---|
| Site: | MAGNOLIA |
| Member Name: | ONIER VARGAS |
| Member ID: | ******-MM1 |
| HealthPlan: | Health Net Commercial |
| Primary Care Physician: | MARTIN SMIETANKA MD |

ONIER VARGAS
7353 RUBIO AVE.
SHERMAN OAKS, CA 91401

**Dear ONIER VARGAS:**
HealthCare Partners Medical Group has approved the following referral:
Facility:   WELLSPRING THERAPY INC (818-637-2127)
Specialty: PHYSICAL THERAPY/REHAB
Address:   500 W GLENOAKS BLVD
            GLENDALE, CA 91202
Referring Physician:        KATHLEEN SAVAGE MD
Service(s) Approved:

| Procedure(s) |
|---|
| 97799 UNLISTED PHYSICAL MEDICINE/REHABILITATION SERVICE OR PROCEDURE |

Authorization Date/Number: 10/17/2012 - 08642940
Referral Expiration Date:    01/16/2013

Please note that this authorization is for approved services only. Further care or additional services must be authorized prior to care being rendered. Payment will not be made for unauthorized care or service. All lab and x-rays must be ordered / performed at contracted locations in our primary network. **Please contact the specialist, facility or company at the phone number listed above to schedule an appointment or arrange for service.**

The specialist you are being referred to may not be an employee of the medical group. Most of our specialists are not employed by the medical group, but are independent contractors, who will employ their own independent skill, knowledge, and care in their diagnosis and treatment of your care. These specialists are in a distinct occupation and business apart from the medical group and neither the medical group nor your primary care physician will exercise any control or supervision over the specialist's recommendations for diagnostic testing and treatment.

A co-payment may apply for the service(s) you are to receive. Please verify your financial responsibility with your health plan. Services received, even if authorized, that exceed benefit limitations will be your financial responsibility. You must be eligible with this Medical Group at the time of service for any payment to be made. If you receive a bill which you believe is in error, please contact the provider of service first. You may also contact our Patient Support Center at 1-800-403-4160 for questions about this referral or possible billing errors.

Sincerely,

HealthCare Partners Medical Group

v91-93 HCPMbr_Approval_All



Exhibit E - Page 111

HealthCare Partners Medical Group

October 31, 2012

| | |
|---|---|
| Site: | MAGNOLIA |
| Member Name: | ONIER VARGAS |
| Member ID: | ****-MM1 |
| HealthPlan: | Health Net Commercial |
| Primary Care Physician: | SMIETANKA MD,MARTIN |

VARGAS,ONIER
7353 RUBIO AVE.
SHERMAN OAKS, CA 91401

Dear ONIER VARGAS:

HealthCare Partners Medical Group has approved the following referral:

Referred To: WELLNESS WORKS INC 818-763-0136
Specialty:   PHYSICAL THERAPY/REHAB
Address:     6400 LAUREL CANYON BLVD #560
             NORTH HOLLYWOOD, CA 91606

Referring Physician:   SAVAGE MD,KATHLEEN
Service(s) Approved:

| Procedure(s) | | |
|---|---|---|
| 97001 | PT EVALUATION | 1 |
| 97110 | THERAPEUTIC PROCEDURE, ONE OR MORE AREAS, EACH 15 MINUTES | 48 |

Referral Date/Number:    October 26, 2012 - 01020697R
Referral Expiration Date: January 24, 2013

Please note that this authorization is for approved services only. Further care or additional services must be authorized prior to care being rendered. Payment will not be made for unauthorized care or service. All lab and x-rays must be ordered / performed at contracted locations in our primary network. **Please contact the specialist, facility or company at the phone number listed above to schedule an appointment or arrange for service.**

The specialist you are being referred to may not be an employee of the medical group. Most of our specialists are not employed by the medical group, but are independent contractors, who will employ their own independent skill, knowledge, and care in their diagnosis and treatment of your care. These specialists are in a distinct occupation and business apart from the medical group and neither the medical group nor your primary care physician will exercise any control or supervision over the specialist's recommendations for diagnostic testing and treatment.

A co-payment may apply for the service(s) you are to receive. Please verify your financial responsibility with your health plan. Services received, even if authorized, that exceed benefit limitations will be your financial responsibility. You must be eligible with this Medical Group at the time of service for any payment to be made. If you receive a bill which you believe is in error, please contact the provider of service first. You may also contact our Patient Support Center at 1-800-403-4160 for questions about this referral or possible billing errors.

EXHIBIT F

Routine For:
Created By: Natalie Lopez, PT, DPT

Nov 05, 2012

### HIP / KNEE - 76  Knee Extension (Sitting)



Place ___0___ pound weight on _left_ ankle and straighten knee fully, lower ___slowly___.

Repeat ___10___ times per set.
Do ___2___ sets per session.
Do ___1___ sessions per day.

### HIP / KNEE - 46  PROM: Knee Flexion

can do lying down



With towel around _left_ heel, gently pull knee up with towel until stretch is felt. Hold ___5___ seconds.

Repeat ___10___ times per set.
Do ___2___ sets per session.
Do ___1___ sessions per day.

*Copyright © 1999-2010, VHI*



EXHIBIT
8
Vargas

Page 1 of 1

Routine For: Vargas, O
Created By:

Nov 01, 2012

HIP / KNEE - 11  Strengthening: Quadriceps Set



Tighten muscles on top of thighs by pushing knees down into surface. Hold __10__ seconds.

Repeat __10__ times per set. Do __1__ sets per session.
Do __1-2__ sessions per day.

HIP / KNEE - 17  Strengthening: Straight Leg Raise (Phase 1)



Tighten muscles on front of left thigh, then lift leg straight up from surface, keeping knee locked.

Repeat __10__ times per set. Do __1__ sets per session.
Do __1-2__ sessions per day.

LOWER LEG - 14  Gastroc



With strap or towel around ball of foot, gently pull back until stretch is felt. Hold 30 seconds.

Repeat __2__ times. Do __1-2__ sessions per day.



Leg Prop

Prop foot up on another chair and let knee hang down

Knee bends

· slide heel in towards your butt as far as you feel comfortable

· Do 10x



← slide heel in.

Copyright © 1999-2010, VHI

Exhibit F - Page 114

# EXHIBIT G

12-15-12                    This note

To whom it may concern:

This note is to inform that I Oriel J Vargas was out of work on a medical leave from october 5 to november 19 due to a atroscopic Knee surgery.

Thank you      Oriel Vargas

EXHIBIT
9
Vargas
PENGAD 800-631-6989